UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

JONATHAN WEISS,

                              Defendant.

**<u>DEFENDANT'S
SENTENCING
MEMORANDUM</u>**

21-CR-449 (PMH)

## <u>INTRODUCTION AND PREFACE</u>

Prison will not remedy what happened here. It will neither rehabilitate Jonathan Weiss nor will it punish him any more than the 29 months behind bars he's already served or the losses of his daughter, marriage, and career he's suffered.

Eliana Dockterman wrote in Time Magazine in 2018 that "[m]ost people find it difficult to reconcile the hope that rehabilitation is possible with the impulse to push these [sex offenders] to the periphery of society forever. Punitive measures alone, however, have not been found to meaningfully increase community safety. Meanwhile, therapy–when paired with tough parole restrictions–can significantly reduce the chance of re-offending, according to the American Psychological Association [and the American Public Health Association]."[1] This sentiment has been repeated in studies published in the Journal of the American Academy of Psychiatry and the Law[2] and the Current Psychiatry Reports.[3]

---

[1] Eliana Dockterman, *Can Bad Men Change? What It's Like Inside Sex Offender Therapy*, Time Magazine, May 14, 2018, available at https://time.com/5272337/sex-offenders-therapy-treatment/. A copy of this article is enclosed at **Exhibit C**.

[2] Fred S. Berlin, *Evaluating and Reducing Risk in Online Child Pornography Cases*, American Academy of Psychiatry and the Law Online, April 2019, available at https://jaapl.org/content/early/2019/04/15/JAAPL.003832-19/tab-article-info ("Urges to view child pornography cannot be punished away, any more so than an urge for heroin or alcohol can be punished away. Under such circumstances, treatment may be a critical component in reducing whatever risk may exist."). A copy of this article is enclosed at **Exhibit C**.

[3] Tyler N, Gannon TA, Olver ME, *Does Treatment for Sexual Offending Work?*, Current Psychiatry Reports, July 1, 2021, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8249288/ ("Recent research suggests that offense-focused psychological treatment for sexual offending shows some level of effectiveness in reducing both sexual and

But prison is exactly where Jonathan is headed because that's what he agreed to when he accepted responsibility for his actions. He can't even afford a fine or restitution to make up for it.

So, the question is, how do we balance the knowledge that Jonathan must go to prison for at least 10 years, and possibly more, against the equally compelling fact that treatment may be more beneficial in the long run? Where do we draw the line at how much more time Jonathan must serve behind bars?

The answer is exceedingly simple. We look at Jonathan's history and the mitigating factors that exist in his life.

## BACKGROUND, CIRCUMSTANCES, AND HISTORY

Much has been said about Jonathan and his history in the comprehensive mitigation packet[4] prepared and submitted by the Consulting Project (Reynaldo Cusicanqui, BA and Mandi Budah, LCSW, MA), the psychosexual evaluation prepared by Empire State Forensics[5], and the Pre-Sentence Investigation Report prepared by Probation. There is no reason to repeat that here.

Suffice it to say that loss and pain define Jonathan Weiss throughout his 32 years of life. Loss of identity. Loss of self-worth and self-esteem. Loss of father. Loss of grandfather and stepbrother. Loss of health. Loss of friends. Loss of a healthy coping mechanism he had early in life. The pain arrived through and persisted after that loss. It consumed him.

That is not to say that there has been no good or joy in his life. Immediately prior to his arrest, Jonathan held not just one but three jobs in the medical field as a physician's assistant making nearly two hundred thousand dollars per year, all before he'd even reached 30 years of

---

general reoffending. Further, there appear to be key program, individual, and study design features associated with treatment effectiveness."). A copy of this article is enclosed at **Exhibit C**.
[4] *See* Mandi Budah, LCSW, MA and Reynaldo Cusicanqui, BA, Presentence Memorandum on behalf of Jonathan Weiss, Consulting Project, October 31, 2022. Copy of this memorandum annexed hereto at **Exhibit A**.
[5] Upon information and belief, Empire State Forensics' psychosexual evaluation was provided to the Court by Probation. A copy can be provided to the Court upon request if necessary.

age. He has a documented history of volunteerism as an EMT and firefighter dating back to 2009 and lasting until the moment of his arrest. His mother, stepfather, and sister continue to love and support him. He even has a two-year old daughter for whom he wants to be a father to in the future. But as the Court will discover—none of the positives did anything to dissuade Jonathan of the notion that he was worth nothing.

While everyone experiences loss and pain, when it happens at a young, formative age and the loss is not addressed in a healthy manner, or is simply just ignored, you can find yourself sliding down a slippery slope of bad habits, quick fixes to dull the pain or feel something other than empty, and even criminal behavior. That's especially true when your core belief is that you are not good enough; it often results in an identity that you are bad, and you begin to act accordingly.

Those experiences warped Jonathan's perceptions of himself and the world around him. He found it difficult, if not impossible, to process external stimuli in what we would deem a correct way. In fact, we believe that Jonathan never would have engaged in this behavior had he not felt programmed to rely on external validation to support his identity and make him feel worth anything more than nothing.

Although his behavior started out innocently enough insofar as he made connections with peer-aged women over social media and through his work at the hospital, he soon found comfort and validation in the responses he received from the increasingly younger girls he contacted, especially when he could conceal the parts of himself of which he felt ashamed. The fact that Jonathan reported how this behavior increased his mood, eased his stress, and calmed his anxieties is indicative of the point raised earlier—that the only thing he knew how to do was look for a quick fix.

Finally, Jonathan accepted responsibility for his actions in a way that bucked the feeling of "I'm not good enough". He isn't just sorry in the sense that he feels like a terrible person and his actions all stemmed from that identity. He's sorry that he didn't take responsibility for his mental, emotional, and sexual health and wellbeing sooner. Jonathan has that opportunity now. We hope that his losses and pain will be addressed in a more productive manner through treatment, counseling, and rehabilitation and that he develops healthier habits and coping mechanisms as a result. Thankfully, he has expressed willingness to do just that.

## DISTRICT COURTS MUST STRIVE
## TO AVOID FEDERAL SENTENCE DISPARITIES

For individuals convicted of offenses under 18 USC 2422 (b), Congress authorized federal prison sentences from the statutory mandatory minimum of 10 years to a maximum of life. Given that the United States Sentencing Guidelines do little to narrow our rubric between the minimum and maximum in Jonathan's case[6] [7], we must endeavor to fashion a sentence that comports with the sentencing factors identified at 18 USC 3553 (a). Here, we seek only to address Congress' requirement that District Courts actually consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct". 18 USC 3553 (a) (6). *See* United States v. Kourani, 6 F.4th 345, 357 [2d Cir. 2021] (must be clear

---

[6] *See* Pre-Sentence Investigation Report, paragraph 105 (noting that Mr. Weiss's offense level if 43 and therefore the guideline range is life).

[7] A guideline range of life is substantively unreasonable on these facts. The United States Probation Department agrees in Mr. Weiss' case insofar as they recommended 180 months. Substantive reasonableness review is a backdrop against shockingly high or low sentences, or sentences that are otherwise unsupportable as a matter of law. *See* United States v. Dorvee, 616 F.3d 174, 183-184 [2d Cir. 2010] ("Consequently, adherence to the Guidelines results in virtually no distinction between the sentences for defendants like Dorvee, and the sentences for the most dangerous offenders who, for example, distribute child pornography for pecuniary gain and who fall in higher criminal history categories. This result is fundamentally incompatible with § 3553(a). By concentrating all offenders at or near the statutory maximum, § 2G2.2 eviscerates the fundamental statutory requirement in § 3553(a) that district courts consider 'the nature and circumstances of the offense and the history and characteristics of the defendant' and violates the principle, reinforced in [Gall v. United States, 55 U.S. 38 (2007)], that courts must guard against unwarranted similarities among sentences for defendants who have been found guilty of dissimilar conduct."); and United States v. Tutty, 612 F.3d 128 [2d Cir. 2010] (defendant's sentence for child pornography vacated after district judge found to have erred in not considering non-guidelines sentence because guidelines can create unreasonable result in cases involving child pornography).

from the record that the district court actually considered the § 3553(a) factors in determining the sentence). "[T]he § 3553 (a) concern with sentence disparity … is concerned with unjustifiable difference across judges or district." <u>United States v. Pisman</u>, 443 F.3d 912, 916 [7th Cir. 2006]. This is, after all, the crux of the post-<u>Booker</u> paradigm—reduction of sentence disparities.[8]

Therefore, with 18 USC 3553(a)(6)'s instruction in mind to craft a sentence that avoids unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, we respectfully ask Your Honor to utilize the institutional memory of the Southern District of New York to and its sentences involving child exploitation crimes. We believe that such a review in conjunction with Your Honor's thoughtful analysis of the remaining mitigating factors in this sentencing memorandum will justify a sentence that if sufficient but not greater than necessary.

Our own review of sentences on crimes involving exploitation of minors for sexually explicit activity (a mixture of enticement, coercion, and sex trafficking) in the Southern District of New York (a total of 39 such sentences) revealed that District Judges imposed an average sentence of 216 months—a far cry from the statutory maximum of life in prison that the guidelines would see Jonathan serve. Several of the above-average sentences addressed actual or attempted physical contact with minors (some of the contact being violent in nature), multiple victims, and several years of exploitative behavior. Some of these defendants committed their crimes after already registering as sex offenders or had been known to have engaged in similar conduct prior to their

---

[8] *See* <u>Rita v. United States</u>, 551 U.S. 338, 382 [2007] ("<u>Booker</u>'s retention of these statutory procedural provisions furthered the congressional purpose of 'iron[ing] out sentencing differences,' 543 U.S., at 263, 125 S.Ct. 738, and 'avoid[ing] excessive sentencing disparities,' <u>id</u>., at 264, 125 S.Ct. 738. It is important that appellate courts police their observance.").

crimes of conviction.[9] Still others received sentences close to the average after they went to trial and were convicted, as opposed to accepting responsibility like Mr. Weiss did.[10]

There was one sentence we found particularly insightful. District Judge Colleen McMahon recently sentenced Jonathan Skolnick to 180 months in prison for his conduct enticing minor children to send him nude and sexually explicit photographs and videos of themselves over the Internet.[11] Unlike Mr. Weiss, whose behavior did not bleed over into his career, Jonathan Skolnick abused his position as an assistant principal to collect sexually explicit material from approximately one hundred minors, including his own students.

To impose a sentence in Mr. Weiss' case anywhere near the average of 216 months, much less the statutory maximum of life, against this backdrop would create the unwarranted sentencing disparity Congress cautioned us against in 18 USC 3553 (a)(6).

In cases such as this, we've always found Nebraska District Judge Joseph F. Bataillon's analysis regarding sentence disparity instructive: "[the defendant's] conduct falls at the lower end of the continuum of criminal conduct—from possession to advertising to distribution to production to predatory abuse and active operation of an abusive enterprise—that harms children. The mandatory minimum sentence … takes into account the serious nature of the defendant's conduct, while remaining proportional to the sentences for more serious offenders as well as less culpable non-production offenders." United States v. McGrath, 2014 WL 351975 [D.NE. 2014].

---

[9] For instance, Robert Garneau, a registered sex offender, received a sentence of 192 months on multiple convictions for enticement. *See* https://www.justice.gov/usao-sdny/pr/warwick-man-sentenced-16-years-prison-enticing-minors-engage-sexual-activity. Samuel Terwilliger, who admitted in his PSR to having sex with a minor, was sentenced to 144 months after enticing a minor for sexually explicit material. *See* https://www.justice.gov/usao-sdny/pr/sullivan-county-man-sentenced-12-years-prison-attempting-entice-minor-engage-sexual.
[10] *See* https://www.justice.gov/usao-sdny/pr/ghislaine-maxwell-sentenced-20-years-prison-conspiring-jeffrey-epstein-sexually-abuse.
[11] *See* https://www.justice.gov/usao-sdny/pr/former-associate-principal-and-high-school-teacher-sentenced-15-years-child-enticement.

The same is true for Mr. Weiss. His conduct is not at the most egregious end of the spectrum defined by Judge Bataillon. Therefore, the mandatory minimum of 10 years (120 months) would be a just and appropriate sentence for Mr. Weiss.

### DEFENDANT'S LOSS OF SELF-WORTH AND THE SEXUAL ABUSE HE SUFFERED WERE PROXIMATE CAUSES OF THESE ALLEGATIONS

It has often been said that hurt people hurt people. Mr. Cusicanqui and Ms. Budah opined that Jonathan's "childhood experiences of bullying, sexual abuse, feelings of self-loathing and loneliness, social limitations and poor emotional self-regulation appear to have been key instigators of his delinquent and abnormal sexual behavior."[12]

Jonathan began internalizing that he was "not good enough" when he watched his father, who emancipated himself from his own son, kiss another man while swimming naked in the family's pool at just 4-5 years old. This emotional and sexual confusion was exacerbated when he was sexually abused on multiple occasions by his babysitter at 11 years old. A review of the Presentence Memorandum revealed that the sexual abuse Jonathan endured before he even reached his teenage years caused him to simultaneously feel disturbed at the thought that he was like his father, something clearly maligned by his family, and that he wasn't good enough to get it up for the babysitter. He didn't understand what was going on. He didn't just think he wasn't good enough. He thought there was something wrong with him.

Jonathan's self-esteem and identity took an even deeper dive after medications he was prescribed for childhood illnesses caused him to put on weight, which in turn caused him to be severely bullied. His self-esteem reached an all-time low when he was forced to quit football—the one healthy coping mechanism he had in high school—after being diagnosed with a rare clotting

---

[12] **Exhibit A**, page 25-26

disorder "that caused him severe physical limitation and lifelong alterations to his daily living."[13] As noted by the Presentence Memorandum, "[a]dolescents, when receiving chronic illness diagnoses during critical developmental periods, tend to struggle more as self-esteem is more dependent on perceptions and behaviors of others, typically peers and family, as in the case of Mr. Weiss."[14]

All these incidents of psychological damage "resulted in feelings of self-loathing, inadequacy and loneliness, ultimately culminating in significant mental health issues and inability to effectively manage stress and emotions. This has resulted in functional changes in the brain and early onset anxiety. Mr. Weiss' ability to mediate cognitions and emotions has been dramatically impacted, significantly affecting global decision making and cognitive processing skills, and he has resulted to sexually acting out behaviors to cope with distress, emotion dysregulation and mental health symptomatology."[15]

We're certainly not suggesting that he not be punished because he suffered loss in his life or was sexually abused himself. After all, this entire process reveals just how much we're responsible for ourselves and our conduct, and we know that Jonathan will be sentenced to prison. We're asking, though, that the hurt Jonathan has suffered, the hurt he never adequately addressed at a young age, be acknowledged and taken into consideration when deciding how much time he must serve in prison.[16]

---

[13] **Exhibit A**, page 7.
[14] **Exhibit A**, page 37.
[15] **Exhibit A**, page 29.
[16] *See* United States v. Rivera, 192 F.3d 81, 84 [2d Cir. 1999] ("It seems beyond question that abuse suffered during childhood – at some level of severity – can impair a person's mental and emotional conditions...in extraordinary circumstances…"); United States v. Brown, 985 F.2d 478 [9th Cir. 1993] (court justified in granting downward departure based on defendant's childhood of abuse and neglect being a primary cause of his criminal behavior); and United States v. Hubbard, 369 F.Supp.2d 146 [D. Mass 2005] (imposing below guidelines sentence because defendant's childhood trauma including sexual molestation and death of siblings).

## THE TWIN, INSIDIOUS STIGMAS OF A
## <u>FELONY CONVICTION AND LIFETIME SEX OFFENDER STATUS</u>

Jonathan will now, and throughout the rest of his life until his death, be a felon. But he won't just be a felon. His conduct will also cause him to be branded as a sex offender—a scarlet letter and undeniable death knell for his professional and social lives. Jonathan will be forced to reveal to the public at large, prospective employers, and significant others his past, almost as if he must lift his shirt sleeve to show them the festering, scarred brand itself. His name, picture, and crimes of conviction will be published for all to see. People will look away in disgust. There is no relief. These stigmas will likely hamper his ability to be employed in any meaningful manner when compared to his education and achievements. It has already cost him his marriage and access to his daughter. The advisory sentencing guidelines make no provision for this undeniable and inescapable punishment. Accordingly, the court is free and encouraged to consider the effects of both a felony conviction[17] and sex offender status[18] under the provisions of 18 USC 3553 (a).

## <u>LENGTH OF PRETRIAL CONFINEMENT</u>

Jonathan has been incarcerated since the date of his arrest and remand—June 11, 2020. By the time we reach sentencing, Jonathan will have been in jail for 29 months. Such incarceration, without access to rehabilitative services recommended by both the Consulting Project and Empire State Forensics, is simply the warehousing of a human being. Accordingly, the time spent in this

---

[17] *See* <u>Yates v. United States</u>, 574 U.S. 528 [2015] ("For life, he will bear the stigma of having a federal felony conviction."); <u>United States v. Smith</u>, 683 F.2d 1235 [9th Cir. 1982] ("The stigma of a felony conviction is permanent and pervasive."); and <u>United States v. E.L.</u>, 188 F.Supp.3d 152 [E.D.N.Y. 2016] ("Defendant's life will always be shadowed by the stain of a federal conviction.").

[18] *See* <u>United States v. Autery</u>, 555 F.3d 864 [9th Cir. 2009] (court's downward variance on its own was not unreasonable where, in part, defendant was required to register as a sex offender); <u>United States v. Garate</u>, 543 F.3d 1026, 1028 [8th Cir. 2008] (appropriate for the district court to consider the deleterious effects of being required to register as a sex offender under 18 USC 3553 (a)); <u>United States v. Baird</u>, 580 F.Supp.2d 889 [D.Neb. 2008] (below guidelines sentence warranted when defendant has already suffered serious consequences such as loss of career, will suffer stigma for felony conviction of possession of child pornography, and will have to register as a sex offender); and <u>United States v. Wachowiak</u>, 412 F.Supp.2d 958 [E.D. Wisc. 2006] ("guidelines failed to account for the significant collateral consequences defendant suffered as a result of his conviction" such as the ruining of a career and the "stigma of being a convicted sex offender").

9

manner is its own substantial penalty and punishment and is entitled to greater credit for this reason. Such conditions would not constitute a part of the incarcerated goals and protocols of the Bureau of Prisons. It is noteworthy that Jonathan's pretrial confinement has not been marred by any disciplinary action.

## **DEFENDANT IS AT LOW RISK TO RE-OFFEND**

The likelihood that defendant "will engage in future criminal conduct [is] a central factor that district courts must assess when imposing sentence." Pepper v. United States, 131 S.Ct. 1229, 1242 [2011].

Jonathan's participation in the evaluations by both Empire State Forensics and the Consulting Project, which consisted of reliable metrics on recidivism in sex offense cases, revealed that he is a low-to-average risk to commit any new sexually based offenses. They specifically found that his criminal behavior suggested that he had no interest in any contact-based offenses. In concluding that long-term incarceration is not warranted for Mr. Weiss, the Consulting Project reasoned that "[a] minimal period of incarceration combined with probation supervision and specific sex offender intensive treatment will best meet the needs of providing long term solutions and the prevention of recidivism".[19] Empire State Forensics agreed when they noted that "Mr. Weiss's reports of an investment and amenability to treatment are prognostically favorable."[20]

Even in cases involving child pornography, a District Court can properly vary downward from a guidelines sentence when it finds that a defendant is a low risk to re-offend.[21] Your Honor should consider doing the same here.

---

[19] **Exhibit A**, page 42.
[20] Empire State Forensics, Report of Psychosexual Evaluation of Jonathan Weiss, page 16.
[21] See United States v. Cherry, 487 F.3d 366 [6th Cir. 2007]; and United States v. D.M., 942 F.Supp.2d 327 [E.D.N.Y. 2013] (ongoing counseling and proof that defendant was not only a low risk to re-offend but also never made actual contact with a minor justified variance to no incarceration).

## DEFENDANT'S LIFE OF PUBLIC SERVICE
## AND GOOD DEEDS SHOULD BE RECOGNIZED

Sometimes it rings hollow to claim that a criminal defendant's life has value in the face of an untold but profound impact on the lives of the people that person has harmed. But the Court will recall that Mr. Weiss dedicated his life to the service of others, first as a volunteer EMT, then as a volunteer firefighter, and finally as a physician's assistant.[22] All this work occurred before Jonathan ever engaged in any criminal behavior, and he certainly never abused those roles to commit any crimes. In fact, the organizations and hospitals he worked for all recognized his efforts with scholarships and awards.

Unfortunately, as both a felon and sex offender, Mr. Weiss will likely never work in medicine again nor will he be permitted to volunteer as a first responder. With treatment and Jonathan's predisposition to service work, we believe it is only a matter of time before he starts contributing to society again. Therefore, punishment should be tempered and cooled with compassion for all the good he's done and for all the good he can do upon release.[23]

## DEFENDANT'S MEDICAL CONDITION SHOULD BE FACTORED INTO SENTENCE

As was revealed in the Consulting Project's Presentence Memorandum, Mr. Weiss suffers from Factor V Leiden[24]—a clotting disorder that "can lead to long term health problems and can

---

[22] Annexed hereto at **Exhibit B** are copies of various certificates and a diploma from Misericordia University where Jonathan entered the school's inaugural program to become a physician's assistant and ultimately obtained his Bachelor of Science Degree in Biology; several certificates and a trophy pertaining to Jonathan's firefighter training; and numerous articles and photographs depicting Jonathan's involvement in the community as a first responder and student at Misericordia University.

[23] *See* United States v. Smith, 275 Fed.Appx. 184 [4th Cir. 2008] (reduced sentence not abuse of discretion in part because defendant "lived an exemplary life to this point, full of 'noteworthy activities'"); United States v. Adelson 441 F. Supp.2d 506 [S.D.N.Y. 2006] (court imposed 42-month sentence on guidelines recommendation of life after noting that it is at sentencing when a defendant's past integrity and many good deeds should be measured against the wrong he committed, especially because 18 USC 3553 (a) asks the sentencing court to account for the history and characteristics of the defendant); and United States v. Acosta, 846 F.Supp. 278 [S.D.N.Y. 1994] (life-saving actions of defendant justified downward variance in sentencing).

[24] *See* https://www.mayoclinic.org/diseases-conditions/factor-v-leiden/symptoms-causes/syc-20372423.

also be life threatening."[25] This disorder requires regular medication maintenance and blood work with a hematologist. Although prisoners are afforded medical care, reasonable minds can agree that it is not the country's best nor is it fast. Given the sensitive nature of Jonathan's crimes of conviction and that specific population's predisposition to victimization in prison[26], more time in prison than is necessary places Jonathan at greater risk for health complications because of his clotting diagnosis. District Courts are obligated to keep such concerns in mind when crafting an appropriate sentence.[27]

## TITLE 18 UNITED STATES CODE SECTION 3553 (A)

We seek a sentence which will be sufficient, but not greater than necessary, consonant with the purposes of sentencing as statutorily set forth in 18 USC 3553 (a) (1-6). Specifically, we believe that the 10-year mandatory minimum would be most constructive given the nature and circumstances of Mr. Weiss' conduct, especially when viewed in the context of the history and characteristics of this defendant as set forth above. Such a sentence will reflect the seriousness of the offense insofar as it accounts for Congress' decision to mandate a prison sentence in cases like Mr. Weiss', and it will certainly deter Mr. Weiss from future conduct while simultaneously protecting the public. Importantly, though, adopting the recommendations made in this

---

[25] **Exhibit A**, page 19.
[26] *See* United States v. Rausch, 570 F.Supp.2d 1295, footnote 8 [D.Colo. 2008] (anecdotal evidence establishes that "violence against inmates especially sex offenders does occur and that vulnerable inmates are at a greater risk of violence than typical inmate populations."); United States v. Lara, 905 F.2d 599, 605 [2d Cir. 1990] (defendant's nature made him particularly vulnerable to prison victimization); United States v. Long, 977 F.2d 1264, 1277-78 [8th Cir. 1992] (defendant's extreme vulnerability in prison justified downward departure); and United States v. Parish, 308 F.3d 1025, 1028 [9th Cir. 2002] (child pornography defendant's high susceptibility to abuse in prison justified downward variance).
[27] *See* United States v. Carmona-Rodriguez, 2005 WL 840464, 4 [S.D.N.Y. 2005] (below guidelines sentence was appropriate given court's obligation to factor in needed medical care); Rausch, 570 F.Supp.2d 1295, 1307 [D.Colo. 2008] (court sentenced defendant convicted of child pornography possession to just one day in jail and lifetime supervised release on 120-month guidelines recommendation because it was the "strongest sentence without putting his life at risk" given defendant's serious health concerns and vulnerability to victimization in prison); and United States v. Hein, 463 F.Supp.2d 940 [E.D.Wisc. 2006] (prison found to be incompatible with defendant's extremely poor health).

Memorandum, would permit Mr. Weiss' return to society where he can seek out the appropriate resources for treatment at a point that would be most beneficial for him and the public. With ongoing supervision once released, the public will be further protected. Finally, this sentence would demonstrate that the veritable absence of other sentence options has been considered, that the unwieldly way in which the United States Sentencing Guidelines are applied to cases like this has been considered, and that sentencing disparities have been duly avoided.

## CONCLUSION

Our hope is that the Court will recall that Jonathan's life has value even after all he's done and craft a sentence that permits him to bring that value back to society after a sufficient period of incarceration full of the treatment he hopes to secure for himself in prison. For all the foregoing reasons, we would respectfully request that Your Honor sentence Jonathan Weiss to the mandatory minimum of 10 years (120 months) in a BOP facility dedicated to sex offender management and treatment, as well as an appropriate term of supervised release[28]. Such a request is not inconsistent with the 180-month recommendation by Probation and the push for sex offender treatment by Empire State Forensics.

Dated:   November 1, 2022
         Newburgh, New York

LARKIN INGRASSIA, LLP

By:

John Ingrassia, Esq. (3304)
*Attorneys for Defendant*
356 Meadow Avenue
Newburgh, New York
845-566-5345
jingrassia@845law.com

---

[28] *See* United States v. Pauley, 511 F.3d 468 [4th Cir. 2007] (incredibly long supervised release component to sentence on child pornography conviction would reduce recidivism, which justified downward variance in sentence).

# EXHIBIT A

# CONSULTING PROJECT

## PRESENTENCE MEMORANDUM

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-against-

Jonathan A. Weiss
Docket # 21-Cr-00449-PMH-1

JUDGE PHILIP M. HALPERN

Marcia S. Cohen
Assistant U.S. Attorney
United States Attorney's office

Respectfully submitted,

Mandi Budah, LCSW,MA
Forensic Social Work Consultant

Reynaldo Cusicanqui, BA
Forensic Mitigation Specialist
CONSULTING PROJECT

John R. Ingrassia, Esq.
Michael A. Collado, Esq.
Larkin & Ingrassia LLP
356 Meadow Avenue
Newburgh, NY 12550
DEFENSE COUNSEL

October 31, 2022

INTRODUCTION…………………………………………………………………..…..Pg. 3

BIO-PSYCHOSOCIAL HISTORY …………………………………………...………...Pg. 5

PARENTS SEPERATION AND TRAUMATIC EVENTS…………………………………Pg. 6

ALCOHOL AND SUBSTANCE USE HISTORY………………………..……...…………....Pg. 8

EDUCATION AND EMPLOYMENT HISTORY…………………………….……………Pg. 8

FAMILY TIES, TRAGEDY AND RELATIONSHIP……………………………………....Pg. 9

COLLATERAL INTERVIEW WITH JANET RADA-MITCHELL……………………….Pg. 11

COLLATERAL INTERVIEW WITH JESSICA FAUST………………………………………Pg. 15

LEGAL HISTORY……………………………………………………………………Pg. 17

HONORS, AWARDS, AND VOLUNTEER HISTORY……………………………………Pg. 17

SIGNIFICANT MEDICAL AND PHYSICAL HEALTH HISTORY………………..……...…Pg. 18

MENTAL HEALTH HISTORY……………………………………………………….....Pg. 19

PROGRESSION OF SEXUAL BEHAVIORS…..…………..……………………………Pg. 21

CLINICAL ASSESSMENT....……………………………………………………....…..Pg. 25

FACTORS RELEVANT TO FUTURE RISK………………………………….....…………Pg. 30

ADDITIONAL RESEARCH REGARDING CAUSE OF SEXUAL OFFENSE………..………..…Pg. 31

RELEVANT IMPACT OF SEXUAL OFFENSE CONVICTION…………………………Pg. 33

FINANCIAL IMPACT OF SEXUAL OFFENSE CONVICTION…………………………...Pg. 36

LONG TERM IMPACT OF CHRONIC ILLNESS……………………………………...Pg.37

INCONSISTENT MEDICAL TREATMENT WHILE INCARCERATED…………………………Pg. 38

CONCLUSION AND SENTENCING RECOMMENDATIONS…..……………………...…………Pg. 39

EXHIBITS:

    1. Character Reference Letters
       a. Janet Rada-Mitchell (Mother)
       b. Jessica Faust (Sister)

**INTRODUCTION**

This presentence memorandum has been prepared by the Consulting Project, a private mitigation and forensic social work firm that assists defense attorneys with evaluations of individual clients and cases with a view toward presenting alternative pleas and sentencing options to the United States District Courts and the United States Attorney's Office.   This memorandum is submitted by Reynaldo Cusicanqui, BA and Mandi Budah, MA, LCSW on behalf of Jonathan Weiss, at the request of his attorneys, John R. Ingrassia and Michael A. Collado.

Mr. Cusicanqui has worked as a Forensic Mitigation Specialist and Sentencing Advocate since 1995. Due to his lengthy experience, he has knowledge of psychosocial contributors and extensive knowledge of criminal behavior derived from evaluating thousands of defendants in various State and Federal court systems.  He has also gained most of his forensic experience in mitigation from being appointed as a Senior Mitigation Specialist on numerous death penalty eligible matters in the United States District Court for the Southern and Eastern Districts of New York.  I, Mandi Budah have worked as a Licensed Clinical Social Worker since 2012 and additionally possess a Master's Degree in Forensic Psychology, obtained in 2010.  With my knowledge of bio-psychosocial contributors, which allows us to evaluate and conclude the factors that affected the defendant's developmental stages that contributed to criminal conduct. This allows the Court to consider a disposition to consider mitigating factors alone with important components of a sentencing proceeding, which takes into account the acceptance of responsibility, respect for the law, and long term plans to prevent recidivism.

The information in this memorandum is based on multiple, extensive in-person interviews with Mr. Weiss, which commenced in August 2020 and the last in person interview

was conducted on October 7, 2022, that took place at the Westchester County Correctional Facility.  In August 20, 2020 we also conducted home visits and in-person collateral interviews with his mother, Janet Rada-Mitchell and his sister, Jessica Faust, who presently reside in Minersville, Pennsylvania. In October 21, 2022 we also performed follow up collateral interviews with Ms. Rada-Mitchell. In addition to the noted interviews, Mr. Weiss' attorney's attorneys provided us with the Presentence Investigation Report, dated September 23, 2022, prepared by Nicole L. DiMaria, U.S. Probation Officer Specialist, along with the Adult Psychosexual Risk and Psychological Evaluation prepared by Sara Liebert, PsyD and Shoshanna Must, Ph.D of Empire State Forensics, dated September 20, 2022, which we reviewed.

During the various interviews and clinical assessments performed while he was in custody, Mr. Weiss presented with symptoms consistent with an anxiety disorder, mostly due to negative life experiences which markedly impacted his development and identity formation, namely childhood bullying and sexual exposure at a young age and sexual abuse.  Based on our clinical experience the noted factors along with other additional contributors precipitated unbalanced emotional states, which included unhealthy sexual stimuli and compromised judgment leading to abnormal development and decision-making process along with deviant sexual offending conduct.

In presenting this memorandum, we wish to highlight specific mitigating factors that we believe deserve consideration for leniency and respectfully recommend that Mr. Weiss be considered for a disposition that is the lowest range of the mandatory guideline range.  These mitigating factors are:

-   Reported witnessing his biological father in a homosexual activity at the age of 5

- History of sexual assault at the age of 11, which has had a permanent effect on successful socio-affective development and ability to regulate stimulus and specific emotions.

- Concurrently being a victim of childhood bullying, due to obesity, medical complexities, which resulted in poor identity formation and emotion regulation.

- As a result of negative experiences during critical developmental stages, Mr. Weiss developed a maladaptive set of coping skills, which contributed to a compulsive personality that hindered his ability to mediate cognitions and emotions.

- There is a history of and current mental health symptomatology, namely anxiety and trauma, both have which have largely gone untreated.

- Mr. Weiss' medical condition can be significantly exacerbated by any physical altercations or injury, while in the custody of Bureau of Prisons (BOP).

- Mr. Weiss has already faced the most significant repercussions of his criminal conduct and conviction. His wife divorced him and has not provided any access to their infant child.

- If Mr. Weiss were to be sentenced to a significant period of incarceration, it would dramatically affect his quality of life and future (due to being a convicted sex offender and the stigma that is part of it) and inability to pursue a career that he has dedicated most of his adult life to.

**BIO-PSYCHOSOCIAL HISTORY**

Jonathan Andrew Weiss was born without complication to the then marital union of Janet Marie Rada-Mitchell (59) and John Weiss (61) on ████ 1990; he is now 32 years old.  He

has one sister, Jessica Faust (28).  Mr. Weiss' stepfather is Edward Thomas Mitchell (66).  Mr. Weiss has been married to Caitlin Weiss (Sorentino) for the past 6 years and together they have a daughter, Callie, who was born on July 2020.  As a result of the pending charges, Mrs. Weiss (Sorentino) has filed for divorce and has had no further contact with her husband.

Mr. Weiss described a complex childhood, growing up in Minersville, Pennsylvania.  A small borough in Schuylkill County, with a population of 4,397, 98.5% White.  It is a blue-collar mining town with a total area of .7 square miles.  The median income for a household in the borough is $28,373 and the median income for a family is $36,759.  There are three buildings in the entire school district[1].

He spoke about positive early memories of his life as he reported having a pool and a playground in his backyard, spending time with his sister, attending church, family dinners and playing outside in the neighborhood.  But he was unable to enjoy all of the great amenities because he was often sick as a child, reporting severe allergies and asthma, which required many hospital visits, multiple medications, and monthly allergy shots.  The prescribed medications caused weight gain and slight obesity, which prompted the onset of years of bullying (described in further detail in subsequent sections of this memorandum).  As a child, Mr. Weiss described he was always somewhat limited in socialization with his peers, and despite being bullied by them, was able to maintain a few friendships. He later described never feeling like he "belonged" to a particular group of friends.

**PARENTS SEPERATION AND TRAUMATIC EVENTS**

When Mr. Weiss was approximately 5 years of age, he reported witnessing his father kissing another man while they were in their home's swimming pool. His parents separated a

---

[1] Minersville, Pennsylvania. https://www.city-data.com/city/Minersville-Pennsylvania.html

couple of years thereafter, due to his father revealing that he was homosexual. His mother moved the family to what he and his sister (noted in detail in her attached letter) described as "a much smaller house." Mr. Weiss described this as a "big change," and reported it was difficult to make friends in the new neighborhood; no one was close to him in age. He did have negative encounters with young neighbors, specifically in incident with a bully in the neighborhood and younger neighbors that chased him and violently threatened him with knives and rocks. Asthma attacks were common and remained one of his biggest memories of childhood. Mr. Weiss reported weekend visitations with his father, which stopped around the age of 11 (his sister continued visitation for several years after). During early adolescence, Mr. Weiss again moved, also in Minersville to the house his mother currently resides in.

In the same year when Mr. Weiss was 11 years of age, he was sexually assaulted by a neighbor who was a teenager that was babysitting him at the time. He denied ever disclosing the assault until June 2020 when he was evaluated by Options Counseling Services, and to us after the arresting incident (additional details are found in subsequent sections of this memorandum).

At a major identity forming stage, Mr. Weiss who was 16 years of age learned of a significant blood clot and genetic condition that caused him severe physical limitations and lifelong alterations to his daily living. This impacted his identity, self-esteem, self-worth, confidence, levels of anxiety, and feelings of adequacy and ability, as he was no longer able to play sports, was placed on medication he will take for the rest of his life and could no longer participate in activities as he used to (additional details are found in subsequent sections of this memorandum).

**ALCOHOL AND SUBSTANCE USE HISTORY**

Mr. Weiss first use of alcohol was at the age of 15 years old. His peers at the time introduced him to liquor. As an adult he admitted to consuming wine with his wife but denied any abuse of alcohol and any history of impactful substance use. He acknowledged that he has never tried, used, or abused any illegal substances.  There is no history of alcoholism or drug addiction in his immediate family.

**EDUCATION AND EMPLOYMENT HISTORY**

Mr. Weiss reported a difficult early educational history, with significant memories of being bullied.  He attended Minersville Elementary School for pre-kindergarten and first grade. He attended Good Shepherd Regional School from second through eighth grades and reported it was difficult to switch to the private school system.  In the second grade, he recalled always "being lumped into the bad kids' group."  He admitted to fighting, but reported he was being bullied daily, for his "bucked" teeth, his size and weight and even the color of his backpack.  Mr. Weiss reported academically, school was never enough to keep him occupied; he was bored.  He maintained above average grades and was always on the Dean's List or Honor Roll.

He attended Nativity BVM High School and described another difficult transition, as many of his friends from middle school chose to go back to public school.  Mr. Weiss remained a victim of bullying and struggled to participate in sports because of his asthma.  He reported multiple friend groups, as he never felt he connected to a core group of friends.  He stated, "I was trying to fit in so I hung out with as many people as I could."  During his senior year of high school, he developed a massive blood clot and was hospitalized for two weeks, returning to school in a wheelchair.

8

Mr. Weiss attended Misericordia University and after a brief struggle adjusting, he described a successful college education. He established a small group of friends and was on the Dean's List and after obtaining his Bachelor's Degree was accepted into the Physician's Assistant (PA) program for his master's degree in 2012. Following graduation in 2014, Mr. Weiss was offered a position with Orange Regional Medical Center, where he was the first physician's assistant to be hired. In 2016, he became the lead Advanced Practice Provider in critical care, a position he held until the arresting incident. Mr. Weiss secured a second, per-diem position at Good Samaritan Hospital in Suffern, New York in 2015. When he learned his wife was pregnant in 2019, he picked up a third, per-diem position at Kingston Hospital working the night shift in the critical care unit. (See professional internet post at https://www.caredash.com/doctors/jonathan-weiss-pa-c-middletown-ny)

Mr. Weiss has a history of employment as a newspaper carrier (2000-2005), as a dishwasher in his grandfather's restaurant (2004-2008), as an asphalt laborer (2005-2011) and as an employee at a Walmart distribution center (summer 2011). While he was in college, he volunteered with Dallas Fire and Ambulance and Back Mountain Regional Fire and Rescue in Dallas, Pennsylvania. In 2015, he became a firefighter at the Mechanicstown Fire District located in Middletown NY, after completing training at the Orange County Fire Training Center.

**FAMILY TIES, TRAGEDY AND RELATIONSHIPS**

Mr. Weiss has always maintained strong relationships with his mother, sister, stepfather, and stepbrother. He described his mother as his best friend, someone he can talk about anything with and described their relationship as loving and supportive. Mr. Weiss reported as he has gotten older, his relationship with his sister has become stronger (See attached character

reference letter for details).  They communicate regularly and love and support one another.  Mr. Weiss lastly reported a good relationship with his stepfather, Edward T. Mitchell who has been in his life since Jonathan was 6 years.  He described a significant loss when his stepbrother Aaron Mitchell, who was 21 at the time, was killed by a drunk driver.  Though the pain was unmanageable at times, the love and support they have for one another helped carry them through that difficult time.

After graduating from high school Mr. Weiss went to college where he met his wife Caitlin. They dated for a couple of semesters and after graduation, he moved to Middletown, New York to be closer to her, as she was from and living in Rockland County with her family at the time.  He described a difficult transition for many reasons, the main one being that it was the first time he was on his own, away from his family (outside of his college experience). He described the Middletown City and surrounding towns as a "culture shock," with more people, diversity, socializing options and things to do.  He however reported feeling socially isolated nonetheless.  Middletown, was very different than Minersville, Pennsylvania, it is a city in Orange County, New York with a population of 28,086, with diversified ethnic groups of 39.7% Hispanic, 36.6% White, 21% African American, 1.9% Asian, and .8% Native American.  There was also a higher median income for a household in the city is $39,570 and the median income for a family is $47,760[2].

Mr. Weiss' focus at the time was work at the Orange Regional Medical Center, Caitlin was not yet living with him (she was working as an Occupational Therapist and was not yet ready to move away from her family), and he had not yet established a group of friends or close colleagues.  After seven years of dating, Mr. Weiss proposed in the fall of 2015 and the pair was married on October 7, 2016.   Following their marriage, they began living together in

---

[2] Middletown, New York. https://Middletown,_Orange_County,New_York#Demographics

Middletown, New York.  Mr. Weiss described a strong relationship with his wife, reporting the pair were saving to purchase a home and enjoyed spending time with friends and family together. Caitlin became pregnant in 2019 and their daughter was born on July 2020, while Mr. Weiss was incarcerated.  He reported the day she learned of his alleged behavior, she sought an attorney and filed for divorce.  Mr. Weiss was unable to comment on the status of their legal proceedings, but reported his wife threw away many of his things, emptied their joint banking accounts and has not been cooperative with his mother as it relates to advocating for him or contributing to this memorandum.

**COLLATERAL INTERVIEW WITH JANET RADA-MITCHELL**

Ms. Janet Rada-Mitchell is the mother to Mr. Weiss.  During her collateral interview, she reported she was born and raised in Pennsylvania.  She attended Catholic school for 8 years and Minersville Area School District for 4 years.  She did not attend college.  At the age of 21, she married her ex-husband John Weiss and had her son when she was 28 years of age and daughter when she was 30 years of age.  Ms. Rada-Mitchell separated from her husband after 11 years together.  After having suspicions of her own, she went to a bar he was at one night and witnessed him with another man. He later admitted to her that he was homosexual.

Prior to her divorce, she described a complacent marriage.  She reported she was young and thought "life would be wonderful" if she were married.  She recalled he never worked, so she worked a lot.  He never wanted children and did not have the same values and goals as her. She denied all incidents of abuse and reported they got along if she "did what he wanted."  At the time, she did not know his true sexual orientation.  They often did things separately and she stated, "I didn't know any better at the time."  When she found out he was seeing other men, Ms.

Rada-Mitchell left with the children and filed for divorce.  She reported her son maintained a relationship with him until he was 7 years of age.  He was legally emancipated from his father on his 18th birthday.

Ms. Rada-Mitchell described a basic, simple life in Minersville, Pennsylvania.  She worked in her ex-husband's father's restaurant prior to her divorce and then at Reading Anthracite, a coal mining company, in the trucking department, managing over 100 employees, before securing a position in food service in the school system, where she has been for the past 21 years.  She reported her children were 4 and 5 years of age when she began working in the school.  Her mother, Phyllis Rada (86) cared for the children while she was working.  For the past 22 years, Ms. Rada-Mitchell has been married to Edward Mitchell (66), who both of her children refer to as "dad."  He has been influential in raising them and has been a positive male role model.

Ms. Rada-Mitchell recalled her son was ill since birth, reporting he was born with asthma and when he was 2 days old, developed a fever and staph infection, caused from circumcision.  She spent one week in the hospital with her son, without the support of her then husband.  During childhood, she reported taking her son to many specialists and by the age of 5, was receiving weekly allergy shots.  He was often sick, endured many hospital visits for allergic reactions and had a nebulizer at home for chronic bronchitis.  By the time he was 10 years of age, he stopped receiving weekly shots.  She described a difficult experience caring for him, as she was always wondering if he was breathing while sleeping, or if he was going to be okay.  Despite many setbacks and difficulty keeping up with his peers, Mr. Weiss always participated in school and community sports, family trips and gatherings, and activities in his neighborhood.

He was an altar boy during childhood and volunteered at the Catholic School. By the time Mr. Weiss was 10 years of age, he was working a paper route and at 12, he was washing dishes in his grandfather's, Steven Andrew Rada, restaurant.  At the age of 16, he became a volunteer EMT, something he continued through adulthood (and at the time of arrest).  During his summer vacations in college, he worked tarring driveways and rode the ambulance daily.  He was always a great student and had goals and aspirations for himself, wanting to become a Physician's Assistant.   Ms. Rada-Mitchell reported her son has been recognized many times for his commitment and dedication to his volunteerism in the communities he has both lived and worked in, namely Middletown, New York and Minersville and Dallas, Pennsylvania.  She reported he spent many years organizing community bingo and block parties and has always been conscientious of the elderly.

There were notable traumatic experiences described by Ms. Rada-Mitchell.

- When Mr. Weiss was 3 years of age, his grandfather was killed in an accident by a drunk driver. He took it very hard since he was very close to him.

- At 4 years of age, he witnessed his father swimming naked in the pool with another man but did not provide any additional details.

- At the age of 7, he ceased all communication with his father.

- At the age of 11, he was molested by an 18-year-old female neighbor, something Ms. Rada-Mitchell did not know until 2020, indicating Mr. Weiss kept this incident to himself for over 20 years.

- The following year, when he was age of 12, his stepbrother, Aaron, who was 21 at the time, was killed in an accident by a intoxicated driver.  This episode of the loss of his step-brother was a life changing event.

13

Ms. Rada-Mitchell reported looking back, she noticed significant changes in her son following sexual abuse. She described he spent more time alone, and in his room, and kept most of his emotions to himself. He always portrayed that things were okay, emotionally, and mentally.

During adolescence, he kept himself occupied with sports, which his mother now believes it was a means of coping and distraction about the sex abuse and loss of a half sibling. Unfortunately, at the age of 16, he developed a massive life-threatening blood clot that required surgery, months of rehab and lifelong use of prescription medication. He could no longer participate in his school football team or any other physical activities. Ms. Rada-Mitchell reported her son was bullied when during this period for both his size (the steroids in his allergy shots significantly affected his weight- he presently is over 6 feet tall and still overweight) and his "rosy cheeks." In high school and college, he was further bullied for having to wear compression "stockings" (due to his blood clot). She admitted to being "overprotective" and managing symptoms of anxiety stemming from her son's medical issues

Despite many traumatic experiences, Mr. Weiss successfully graduated high school and then entered and completed Misericordia University, located in Dallas, Pennsylvania, where he obtained a Bachelor's degree in Biology and later a master's degree in Physician's Assistant. Because of his above average grades he was invited to Board of Trustee meetings, was published in a magazine, and had multiple job offers prior to graduation. Soon after graduation, while socializing with friends, he heard about community volunteer functions. Since he wanted to contribute to his community he became a volunteer as an EMT, and later as a volunteer firefighter. He received multiple scholarships, was awarded a presidential and firefighter of the year award.

Ms. Rada-Mitchell commented on her son's relationship with Caitlin, who filed for divorce soon after his arrest.  Ms. Rada-Mitchell said she tried to assist her son in handling the proceedings, but was negated in all her requests to be part of the child custody deliberations and therefore lost all rights she had as a grandmother. She regretfully be unable to maintain a relationship with her granddaughter.

**COLLATERAL INTERVIEW WITH JESSICA FAUST**

Ms. Jessica Faust is the younger sister to Mr. Weiss.  During her collateral interview, she described a "different perspective looking back."  She recalled growing up in a small family with a father who left when she was 3 years of age.  She maintained a relationship with her biological father until she was 19 years of age but reported being raised by her stepfather and her "nanny." She described a great childhood but recognized that her mother and stepfather struggled with finances.  She reported it was hard as a child not to be able to go on trips but knows both of her parents worked hard for what they had.  She described growing up in a small town, a small community, and a small school, and did not have many outside experiences.

She described herself as extroverted and her brother as introverted.  Growing up, she reported most of her mother's attention was on her brother, being worried about him and if he was sick.  He was able to carry more responsibility, and she reported he was trusted more than she.  For example, Ms. Faust had to be at a friend's house if their parents were not home, while her brother was able to stay home alone.  She reported her mother struggles with anxiety, requires both children to text or call daily and notices she becomes upset when Mr. Weiss cannot do things.  She described her mother as "overprotective," but only when it relates to Mr. Weiss' medical issues.  Mr. Weiss denied feeling negatively affected, as he knew his mother's goal was

to keep him healthy and safe.  Ms. Rada-Mitchell confirmed her struggle with anxiety, stating "I have been worried about him since day one."

She described her brother is smart, school came easy for him, he never needed to study, and he is funny.  She reported a close family relationship.  She maintained a relationship with her biological father until she was 19 years of age stating, "I thought it was what I was supposed to do."  After he moved further away, she reported their communication became less frequent; she was the only one reaching out and after he emancipated her at 18, their relationship faded.

Ms. Faust described her brother had significant medical issues as a child, namely allergies and severe asthma and was frequently on medication or in the hospital.  She reported his prescribed steroids caused him to gain a significant amount of weight, something he was bullied for.  She recalled he was made fun of and could not do a lot of things that other kids were.  When he was 16, he was put in a wheelchair after suffering a blood clot and was no longer able to participate in sports.  This experience caused him to view life and experiences differently, as he had other things to worry about and a new set of precautions to take.  She recalled he was witty, and always found a way to mask any emotional pain from being bullied.  Though he has always had sporadic friends, Ms. Foust described he has never had a "long, confidential worthy friendship."

Ms. Faust reported though Mr. Weiss had many female friends, while in college he never had intimate relationships with them.  He casually dated but he did not bring anyone home to meet his family nor were any relationships long lasting.  She recalled he met Caitlin his freshman year of college but was never sure she was the right person for him, noting they disagreed on many things, had different values and she may have "held him back."

16

In regard to emotions, mental health and personality, she described her brother at times can be short-fused.  She reported he struggles with anxiety and has a "perfectionist mentality." She reported he needs structure and order, and time is incredibly important to him. She believes he may suffer from depression, but could not say so with confidence, noting he does not open up to anyone and does not express emotions.  Ms. Faust believes her brother has a fear of judgement and disappointment, stemming from their father's sexuality and then leaving at an impressionable young age.

## LEGAL HISTORY

The pending criminal matter is Mr. Weiss' first arrest and conviction. He has no other documented contact with the criminal justice system.

## HONORS, AWARDS, AND VOLUNTEER HISTORY

Mr. Weiss has a long history of giving back to his community.  He served as an altar boy during childhood at his local church. When he was 16 years of age, he became an EMT, volunteering at the Goodwill Fire Company in Minersville, Pennsylvania, something he had always wanted to pursue since childhood.  He volunteered at St. Matthew the Evangelist Church in Minersville, Pennsylvania, coordinating Bingo nights and Chinese Auctions for various fundraisers.  Mr. Weiss further coordinated block parties, barbecues and soup sales with the Rescue Hook and Ladder Fire Company, also in Minersville, Pennsylvania.  After college he officially became a volunteer firefighter.

Mr. Weiss has been recognized many times for his hard work, commitment, dedication, professionalism, and success beginning in childhood, when he was awarded Paper Boy of the

Year.  Prior to his medical complications he was captain of the football team from 2004-2008 and received the Presidential Award for Athletics in 2004.  The same year he was awarded the Bishop Award for Academics and was awarded a scholarship for high school.  He was the Junior Class Vice President in 2007 and the Senior Class President in 2008.  He has a long history of making the honor roll, serving as a class advisor, being recognized as "Who's Who" among students, and making the dean's list.  In 2008, he was awarded a $4,000 scholarship for Leadership and Volunteerism, a $2,000 scholarship from 1st National Bank for Academics and was awarded the McCarley Award for Academics, a $22,500 scholarship.  While in college, Mr. Weiss was selected by administration to serve as a peer advocate as well as the food committee president, where he was one of 84 students to represent the student body.  He was chosen by college trustees to interview the new President of his university.  He presented research to the board of trustees and was featured in multiple newspapers and magazines.  He was involved in the Campus Ministry all four years of college, chosen to participate by the President and Dean of Students.  Mr. Weiss was awarded Employee of the Month at Orange Regional Medical Center in March 2016 and April 2018.  He was awarded Firefighter of the Year by the NYFD in 2012 and 2016 and was awarded the prestigious Pop Hicks Training Award for Dedication and Leadership in Training Exercises in 2019 by the NYFD.

**SIGNIFICANT MEDICAL AND PHYSICAL HEALTH HISTORY**

Twenty-four hours after birth, Mr. Weiss faced the first medical challenges of his life, he developed a fever and staph infection from circumcision, and was diagnosed with severe asthma. He spent much of his childhood in and out of the hospital, treating allergic reactions.  By the

time he was 5 years of age, he was receiving weekly allergy shots, which he stopped when he was 10.  He had chronic bronchitis as a child and used a nebulizer at home.

When Mr. Weiss was 16 years of age, he was stepped on at football practice, causing a lump on his leg to develop that later subsided.  At the age of 17, he started having leg and back pain and reported his legs would turn purple.  He went to the emergency room and was told it was just muscle pain.  After traveling to Washington DC, he saw his internist because the pain would not subside.  He was diagnosed with a blood clot.  He was sent for an ultrasound where it was determined he was suffering a massive blood clot.  He was hospitalized at Pottsville and Guysinger Hospitals for two weeks.  He required surgery and learned that a mass of clot tissue was found in his abdomen.  He required the use of a wheelchair, walker, and compression stockings.  He has since been diagnosed with Factor V Leiden[3], a mutation of one of the clotting factors in the blood. This mutation increases the chance of developing abnormal blood clots, most commonly in the legs and lungs and can lead to long term health problems and can also be life threatening.  Since the age of 16, Mr. Weiss has been prescribed Warfarin (Coumadin), which he will have to take for the rest of his life.


**MENTAL HEALTH HISTORY**

Mr. Weiss reported a history consistent with symptoms of anxiety since childhood.  He was unable to recall a specific age at which symptoms began.  There is a history of chronic illness and bullying, due to his height and weight, since childhood, which both have impacted levels of self-esteem, confidence, and secure identity formation.  He reported experiencing symptoms of anxiety most of his life, but stated, "I hide it well."  He described intrusive and

---

[3] Factor V. Leiden described https://www.mayoclinic.org/diseases-conditions/factor-v-leiden/symptoms-causes/syc-20372423

racing thoughts, interrupted sleep, and restlessness.  During early childhood, Mr. Weiss reported playing and building with Legos as a coping skill to manage his anxiety.  As early as the 4th grade, Mr. Weiss described twitching of his eyes and nose, tics and rocking in his chair as manifestations of his anxiety.  He described a general feeling of not belonging or and would often hide in his room playing videogames.  He denied any history of sadness, poor hygiene, self-harm, and depression as well as previous treatment.  His mother and sister confirmed the symptoms he reported.

Research has clearly recognized being victimized by bullies as a health problem for school children and is associated with a range of adjustment problems, including poor mental health.  Several wide scale studies utilizing self-reports suggest that victims of bullying all share psychosocial adjustment difficulties such as depression, psychosomatic problems, feelings of insecurity and loneliness.  Additional clinical studies have indicated that children targeted by bullies show signs of distress including depression and anxiety, as well as adjustment problems in late adolescence and adulthood.[4]  Victims of bullying are lastly at increased risk for poor self-esteem and criminal activity.[5]

There are a variety of potential mechanisms that can explain why bullied children manifest early signs of psychopathology.  It has been suggested that the physiological changes in the biological stress response system mediate the association between early adverse experiences and anxiety disorders.   Meaning, victims of bullying become hyper- or hyposensitive to stress, explaining why they may develop early-onset mental health problems.  Secondly, experiencing bullying at a young age could lead to distortion in the way children interpret their environment.

---

[4] Arseneault, L. Bowes, L. & Shakoor, S. (2010). Bullying victimization in youths and mental health problems: 'Much ado about nothing'? *Psychological Medicine,* 40, 717-729.
[5] Sigurdson, J.F., Undheim, A.M., Wallander, J.L., Lydersen, S. & Sund, A.M. (2015). The long-term effects of being bullied or a bully in adolescence on externalizing and internalizing mental health problems in adulthood. *Child and Adolescent Psychiatry and Mental Health,* 9(42).

They may begin to wrongly attribute causes of negative events to themselves.   Finally, oversensitivity to social cues may impact emotion processing and pose a risk for developing psychopathology.[6]   The effects of bullying are not limited to the period in which the bullying occurs, but can endure for many years, posing significant psychological risk if not properly addressed and treated.

## PROGRESSION OF SEXUAL BEHAVIORS

Mr. Weiss reported he has always lacked self-esteem and feelings of never being good enough.  He reported feeling like he never deserved any success that came to him and struggled with anxiety from a young age.  In relationships, he described always feeling nervous around girls and was anxious he would "mess something up."  Mr. Weiss was first introduced to the concept of sexuality during childhood at an incredibly early age.  Though he reported no one in his family discussed his father's sexuality, he "figured it out on [his] own," and described the scenario as "weird."

At the age of 11, Mr. Weiss was sexually abused by his neighbor, who was a teenager who was babysitting him at the time.  He reported she lived on the same street and they played games in the yard.  During one game, Mr. Weiss yelled to her "I'm going to give you a blow job," not understanding what that meant (He recalled possibly hearing the term on the school bus).  He reported she laughed, explained it to him, sent his sister to another room and told him "I'll show you."  Mr. Weiss reported she performed oral sex on him and he denied having an erection.  On other occasions, Mr. Weiss reported that she requested he "suck on her toes" and if he did, he could kiss her and fondle her breasts.  Mr. Weiss reported over the course of one year,

---

[6] Arseneault, L. Bowes, L. & Shakoor, S. (2010). Bullying victimization in youths and mental health problems: 'Much ado about nothing'? *Psychological Medicine,* 40, 717-729.

this happened on approximately four occasions.  He did not disclose the abuse to anyone, and she demanded he not talk to anyone, as she had a boyfriend.  Mr. Weiss reported the babysitter was 18 at the time.  He described feeling embarrassed and because he did not have an erection, began thinking to himself "I hope I'm not like my dad."  He denied other instances of sexual abuse but reported these instances piqued his interest in girls.

Mr. Weiss reported his first exposure to sexual print material around the age of 10/11. He recalled looking at Playboy magazines in his cousin's closet and he began masturbating around the same time.  He was unable to climax the first few times and described this as an embarrassing feeling.  In the 6th and 7th grades, Mr. Weiss had friends who were interested in pornography and images of graphic murders and he described "excitement" with pornography. He additionally had a friend who located his parent's intimate toys that he would engage in conversation with his friend about.  He denied experimentation.  In 7th/8th grade, he reported his first voluntary sexual experience.  He described playing truth or dare with one other male and two females.  During these games, he kissed the girls, the girls showered together, heterosexual couples would fondle one another, and everyone would watch each other do things to one another, all in the same room.

In the 10th grade, Mr. Weiss had his first girlfriend and experienced and performed oral sex for the first time.  Despite describing the experience as scary and riddled with anxiety, he was able to have an erection and able to climax.  He engaged in sexual intercourse in the 12th grade with a girlfriend at the time.  He engaged in sexual intercourse 2-3 times per week for several months, including the hallway at school, in the basement of friends' parties, in cars and underneath stairwells.

Mr. Weiss reported minimal sexual encounters in college prior to meeting Caitlin. He described a natural progression of their relationship: friends, sleepovers, kissing and fondling, before engaging in intercourse months into their relationship. Mr. Weiss described a feeling of surprise in their relationship, because he always believed he was "out of her league." The pair engaged in intercourse several times per week. The summers that they were not together, they engaged in sexual behaviors over Skype. He reported feeling sexually satisfied in his relationship.

In 2014, Mr. Weiss made the difficult decision to move to Middletown, New York, away from his family, to be closer to Caitlin, to a town she wanted him to move to. The closest person he knew lived 45 minutes away. When the pair was married in 2016, Mr. Weiss reported a change and described that intercourse became more "routine" and there was no longer any "spontaneity." He was living alone, did not have any friends, did not have his wife with him often and quickly wondered how he was going to meet people and make friends. He became friends with the nursing students he worked with on Snapchat and described his conversations over time became promiscuous. At the time he was fearful of continuing to engage in conversation, as he was in a relationship. Out of curiosity and loneliness, he created a fake snapchat account. Over time, Mr. Weiss became friends with people his own age and eventually, through friends of friends, started engaging in conversations with adolescent females. He described his actions at times became difficult to manage and on several occasions, stopped using Snapchat. He formed multiple relationships with people from various states and reported that his relationship with Caitlin was "lacking," though there were no concrete issues. He reported needing "a little more," which Caitlin was not fulfilling at the time. Mr. Weiss reported he enjoyed receiving nude photos, which she would not, so he sought out other means to fulfill

his needs and interests.  Mr. Weiss denied intentionally seeking out adolescent females to engage with.  He described communicating with them as a progression of friends, to friends of friends, and so on.

Mr. Weiss reported using a second phone to take pictures of the ones he received online, to not always be online.  He masturbated to the images 2-3 times per week and denied feeling preoccupied with sex or obsessed with his interactions.  He denied interest in a particular age category.  He did not isolate himself and expressed feelings of guilt after masturbating, mostly because he was in a relationship and because he knew he should not be engaging in interactions with adolescent girls.  He denied becoming irritable if he could not access his account or photos.

Mr. Weiss reported an increase in engagement with negative mood states, stress, boredom, feelings of loneliness and anxiety.  He reported that viewing images, videos and engaging in conversation often increased his mood, eased his stress, and calmed his anxieties, especially during peak periods of loneliness and anxiety.  He reported he knew his actions were wrong and illegal.  He also reported that these conversations and interactions instilled confidence and made him feel good about himself, as attention was being paid to him.

When looking at the age of girls Mr. Weiss engaged in conversation with, it stands to reason that he subconsciously identifies with pre-adolescent and adolescent girls, given his traumatic history and progression of sexual behaviors.  The function and structure of his hippocampus (learning and memory), prefrontal cortex (behavior regulation, problem-solving, and emotional responses), and central nervous system (emotion regulation) have been compromised and impacted as a result of early abuse that now, as an adult, during times of negative mood states, he found himself unable to employ prosocial coping skills, and engaged in

24

conversations freely with adolescent girls, a frame of mind and identification that has been pre-wired.

Since his arresting incident he has spent a great deal of time processing his history of abuse and accepted responsibility for his actions.  He has expressed willingness to participate in individual counseling sessions to address his sexual deviance and predatory behaviors.

**CLINICAL ASSESSMENT**

Mr. Weiss is a 32-year-old married, Caucasian male.  In the various sessions we conducted he presented in a corrections uniform, was disheveled, with low affect and presented with a worried and anxious demeanor.  He stands 6 feet tall and weighs approximately 320 pounds.  He spoke at a normal rate and had a typical flow of speech, at a low volume and clear clarity.  He presented with an anxious and fearful mood with congruent affect, at times sobbing and or with negative demeanor.  He maintained a cooperative attitude throughout all of our interviews and at times requested to respectfully complete the interview because he felt overwhelmed.  He presented with sufficient attention and adequate concentration.  Memory appeared intact.  He was able to think abstractly and was oriented to person, place, and time.  He displayed logical thought patterns, thought content was consistent with reality, and there is no evidence of a thought disorder.  He denied past or present high-risk factors including homicidality and suicidality.

Mr. Weiss' bio-psychosocial history depicts a man who was exposed to significant stressors and early exposure to sexual behavior coupled with consecutive sexual victimization during critical developmental stages that shaped his socio-affective development, personality, reasoning and global decision making.  His childhood experiences of bullying, sexual abuse,

feelings of self-loathing and loneliness, social limitations and poor emotional self-regulation appear to have been key instigators of his delinquent and abnormal sexual behavior.

Given the nature of childhood sexual abuse (CSA) there is a huge problem in trust and interpersonal relationships over the life course. Victims have difficulty in forming intimate relationships; they have increased instability in relationships, displeasure with most sexual partners, and greater negativity towards partners.[7]  In adulthood, sexual risk behaviors have been documented for survivors of child sexual abuse.  Sexual risk behaviors can vary and occasionally mirror the abuse the victim experienced themselves; this can manifest in overt sexual behaviors or in habits founded in deviant and secret keeping behaviors.  In males who were abused, sexual risk behaviors and unsatisfactory relationships were observed at an older age group (26 to 32 years).[8]

Aside from engaging in sexual risk behaviors as an adult, childhood sexual abuse can also impact physical health diagnoses.  The effect of CSA on physical health stems from a complex relationship between behavioral, emotional, social, and cognitive factors.  Survivors more often have surgeries, and are at increased risk of having chronic pain syndromes. Disorders relating to immunology such as irritable bowel syndrome, arthritis, colonic and lung diseases and other psychosomatic disorders also involving the musculoskeletal system were seen to manifest with increased frequency among the victims of sexual abuse in childhood.[9]

In the case of Mr. Weiss, being exposed to pornographic material at a pinnacle stage of development impacted his already conflicted view of inmate relationships.  He internalized and normalized secret keeping habits in intimate interactions, which reinforced the use of accessing

---

[7] Saha, G., & Singh, O. P. Long term consequences of childhood sexual abuse, *Child Sexual Abuse: Indian Scenario,* 15, 71.
[8] Ibid.
[9] Ibid.

pornographic imagery and relationships using technology as an adult. Having witnessed unfamiliar relationship dynamics and not having conversations about healthy, consensual intimate and sexual relationships, both in real life and via pornography placed him at a disadvantage for his own sexual relationships; pornography created a dynamic in which victimization, even his own, was normalized.

Studies on sexual content in the social media (Snapchat, Tinder and other apps) indicate that youth accept, learn from, and may emulate behaviors portrayed in the social media as normative, attractive, and without risk.[10] The research suggests that excessive media use, specifically that which depicts content that is violent, gender-stereotyped, and/or sexually explicit, skews children's world view, increases high-risk behaviors, and alters their capacity for successful and sustained relationships.[11] Children who are exposed to pornography at a young age are at increased risk of normalizing sexual harm because pornographic imagery portrays a lack of emotional relationship between consensual partners, unprotected sexual contact, inappropriate power dynamics, and in some cases, violence.[12] Children and youth are more vulnerable to pornographic imagery because of mirror neurons in their brains. These neurons convince children that are actually experiencing what they see, which plays an instrumental role in how children learn and behave as adults. This is exacerbated by the instant-gratification provided by technology children are now using consistently and with fluency.

The child or teen often perceives viewing online pornography as private and anonymous, which emboldens them to search for material that they would not search for via traditional

---

[10] Villani, Susan. "Impact of Media on Children and Adolescents: A 10-Year Review of the Research." *Journal of the American Academy of Child & Adolescent Psychiatry* 40, April 2001, 392, 399

[11] Rich, Michael. "Sex Screen: The Dilemma of Media Exposure and Sexual Behavior." *Pediatrics* 116, July 2005, 329, 330.

[12] Villani, Susan. "Impact of Media on Children and Adolescents: A 10-Year Review of the Research." *Journal of the American Academy of Child & Adolescent Psychiatry* 40, April 2001, 392, 399

media.[13]   Online pornography provides motivational, disinhibiting, and opportunity aspects that make it different from traditional pornography in terms of potential effects on children and adolescents.   The incomplete development of the child and adolescent brain may contribute to engaging in risky behaviors, which may, in turn, affect the extent to which pornography is sought and then, in turn, acted upon.[14]   Peer pressure exists to exacerbate this dynamic; youth learn from and are encouraged by their peers to participate in activities as a cohesive group, and the desire to fit in outweighs any trepidation.

Youth's ability to process pornography and to understand the many ways that pornography, sex, and relationships differ, or should differ, from real-life sex and relationships is drastically different than that of an adult.   A proposed theory to explain the socializing effect of pornography is the sexual script theory.   Pornography can provide users with sexual scripts they were previously unaware of (acquisition), reinforce sexual scripts they were already aware of (activation), and by portraying the sexual behaviors as normative, appropriate, and rewarding, encourage the intellectual and behavioral use of sexual scripts (application).[15]   The primary concern related to pornography viewing in young children under the age of 12 years is the development of problem sexualized behaviors (PSB).   PSB involve sexual knowledge beyond what would be expected for the child's age and developmental levels, such as children engaging in sophisticated sexual acts such as intercourse or oral sex.[16]

When faced with a major life change, including his marriage and then moving away from his family and the presence of lack of social connections, coupled with the absence of social interaction in a new environment, Mr. Weiss utilized the social media apps to meet new people,

---

[13] Hornor, G. (2010). Child sexual abuse: Consequences and implications. *Journal of Pediatric Health Care*, *24*(6), 358-364.
[14] Ibid.
[15] Ibid.
[16] Ibid.

which commenced with adult women.  As a result of early exposure to sexuality, sexual behavior, and sexual trauma, he was ill-equipped to navigate the copious amounts of interactions from women he received.  The progression and development of interactions with others, combined with feelings of loneliness led Mr. Weiss to seek out sexual encounters via the internet to satisfy his own sexual needs.  When his interactions progressed from legal, adult women to younger, teenage girls, he did not have the resources to mediate his emotions and cognitions to return to healthy sexual interests.

It appears Mr. Weiss is suffering from the underlying psychological effects brought about by the stressors associated with bullying and sexual abuse, which resulted in feelings of self-loathing, inadequacy and loneliness, ultimately culminating in significant mental health issues and inability to effectively manage distress and emotions.  This has resulted in functional changes in the brain and early onset anxiety.  Mr. Weiss' ability to mediate cognitions and emotions has been dramatically impacted, significantly affecting global decision making and cognitive processing skills, and he has resulted to sexually acting out behaviors to cope with distress, emotion dysregulation and mental health symptomatology.  Consistent with his position now, Mr. Weiss did not engage in criminal behaviors with the intent to cause harm to others; rather he has developed a dysfunctional set of coping and problem-solving skills to manage the pain associated with his significant negative childhood experiences.

Mr. Weiss appeared to be forthcoming and engaged during his evaluation and that of the one conducted by Options Counseling Services.  He admitted to acting on his own accord when looking for and engaging with teenage girls on Snapchat.  He admitted to viewing the material on multiple occasions.  He has expressed that recognition of the consequences and an

understanding of the impact of his actions as his primary motivation for addressing this matter and desire to pursue treatment to address his involvement in sexually deviant behavior.

**FACTORS RELEVANT TO FUTURE RISK**

Mr. Weiss does not display a lack of concern for others; in comparison, he has spent the greater part of his life volunteering his time, helping others. There is no documented history of impulsive acts, outside of the instant offense. Mr. Weiss largely demonstrates adequate problem solving, but at times has struggled, because of trauma he endured during critical developmental stages, leading to poor identity formation and low self-esteem. Negative emotionality is a personality trait that refers to the frequency and intensity with which individuals experience anger, sadness, or stress. Mr. Weiss did not report abnormal experiences with anger, sadness, or stress. Mr. Weiss did not identify with deviant sexual interests. He reported greater sexual interests than his wife, but none that would be categorized as deviant. During activity comprised of the instant offense.

Given Mr. Weiss lack of self-esteem and his self-loathing view of himself, it was unfathomable to Mr. Weiss that people were interested in communicating with him. As he continued to interact with others via Snapchat, he was fully aware of his behaviors. He ultimately created a fake identity to protect his relationship with his wife, as his curiosity continued to pique. Mr. Weiss did report using Snapchat and viewing images to cope with emotions, negative experiences and increased stress. Mr. Weiss has no documented criminal conviction and mandated community supervision, suggesting he would be cooperative with supervision.

Mr. Weiss was utilizing the internet to communicate with adolescents. He has since deactivated all social media accounts and is currently incarcerated; therefore, he presently has no access to social media and therefore additional victims. There is no evidence that Mr. Weiss would not be cooperative with supervision, given his successful history and he has no substance use history. He maintains strong family ties and support and though he is currently experiencing increased emotionality, tearfulness and worry, he maintains hope for the future, is able to construct long-term goals and remains committed to specific sex offender treatment to assist in learning and understanding the impact of childhood sexual abuse and how it may have contributed to his criminal conduct.

## ADDITIONAL RESEARCH REGARDING CAUSE OF SEXUAL OFFENDING

The quality of attachments in children and adolescents is well known to impact development of critical self-regulatory functions such as emotional definition and control, cognitive self-definition, and interpersonal expectation. Scholars assert that individuals with disorganized attachment experiences do not adequately develop and/or fail to adequately internalize self-regulatory coping skills, and thus may be more likely to rely on externally based means of coping.[17]   Sexual offending is identified as one of several possible strategies of externally based intra- and interpersonal control, emerging primarily in adolescence in response to several pressures. These include poor interpersonal relationships, childhood experiences with adult sexuality, and the biological and social push of puberty,[18] as in the case of Mr. Weiss. Reliance heavily on external means of coping in childhood and adolescence, often persist into adulthood as the behaviors developed during influential social and emotional stages.

---

[17] Burk, L. R., & Burkhart, B. R. (2003). Disorganized attachment as a diathesis for sexual deviance: Developmental experience and the motivation for sexual offending. *Aggression and Violent behavior*, *8*(5), 487-511.
[18] Ibid.

Childhood sexual abuse impairs the development of the hippocampus, which is crucial for learning and memory consolidation; disrupts functioning of the prefrontal cortex inhibitory activity, which is essential for behavior regulation; and increases activity of amygdala-related circuitry, which is involved in rapid emotion responses.[19]  Alterations in the central nervous system, as a result of abuse and other childhood experiences, lead to deficits in emotion regulation.[20]  Research has additionally looked at the relationship between sexual offenders and brain function, noting that child sex offenders show significant differences in the brain structures that regulate behavior and problem-solving as well as neuropsychological dysfunctions.[21]  The frontal lobe, in particular, is important for normal sexual functioning and impaired frontal lobe function is associated with personality pathology and impaired neurocognitive functioning.[22] Cognitive deficits in child sex offenders appear to be mediated by the prefrontal cortex, which may account for behavioral disinhibition, working memory deficits, disinhibition of automatic motor responses, and impairment of cognitive flexibility.[23]

A new model proposes that there are four distinct clinical pathways, each with a characteristic array of mechanisms derived from various developmental experiences, that when coupled with environmental factors create vulnerability conducive to the commission of a sexual offense.[24]  These pathways are: intimacy deficits, where insecure attachment styles result in low self-efficacy, critical self-evaluation, and poor interpersonal dependence, in turn leading to social isolation, loneliness, and personal dissatisfaction; deviant sexual scripts, where early learning

[19] Sugaya, L., Hasin, D.S., Olfson, M., Lin, K.H., Grant, B.F. & Blanco, C. (2012). Child physical abuse and adult mental health: A national study. *Journal of Traumatic Stress,* 25, 284-392.
[20] Ibid.
[21] Becerra-García, J. A., García-León, A., & Egan, V. (2013). Toward a Neuropsychology of Personality in Sex Offenders Against Children: An Exploratory Psychometric Study. *Journal Of Child Sexual Abuse*, 22(5), 612-623.
[22] Ibid.
[23] Ibid.
[24] Elliott, I. A., Beech, A. R., Mandeville-Norden, R., & Hayes, E. (2009). Psychological profiles of internet sexual offenders' comparisons with contact sexual offenders. *Sexual abuse: a journal of research and treatment*, 21(1), 76-92.

experiences result in the acquisition of faulty cognitive representations of how to behave in sexual encounters, leading to deviant sexual fantasies and arousal; emotional dysregulation, where problematic early social encounters result in difficulties identifying and modulating negative emotional states and the use of maladaptive coping strategies; and antisocial cognitions, where underlying causal schemata used to infer mental states and interpret and predict behavior are faulty, resulting in offense-supportive belief systems in relation to their actions and their victims that justify and maintain behavior,[25] many of which are applicable to Mr. Weiss.

Those with intimacy deficits are described as having low expectations of the efficacy of initiating and maintaining age-appropriate relationships and accessed child pornography at times of loneliness and dissatisfaction,[26] as in the case of Mr. Weiss.  This creates a form of pseudo-intimacy, whereby the images represent a less fearful and accepting "partner" and circumvent problems initiating appropriate sexual relationships. These maladaptive cognitions about the self, such as low self-efficacy and negative self-appraisal, can also lead to problematic use of the Internet in general. The anonymity provided by the Internet may function to lessen social risk and has a powerful disinhibiting effect on users.  Within these social contexts, offenders can normalize their activities and legitimize their orientations and behaviors.[27]

**RELEVANT IMPACT OF SEXUAL OFFENSE CONVICTIONS**

The scientific community has documented a myriad of challenges as it relates to sexual offending and the impact of a sexual offense conviction, including being on the sex offender

---

[25] Elliott, I. A., Beech, A. R., Mandeville-Norden, R., & Hayes, E. (2009). Psychological profiles of internet sexual offenders' comparisons with contact sexual offenders. *Sexual abuse: a journal of research and treatment*, *21*(1), 76-92.
[26] Ibid.
[27] Ibid.

registry, unemployment, and where the individual may live.[28]  Convicted sex offenders in the United States are required to register with a law enforcement agency of any state, locality, territory, or tribe within which they reside, work, and attend school following the minimum standards set by the Sex Offender Registration Act (SORA) of 2006.[29]  While information is provided online, it is considered "community notification" as it is public information. Community notification within this context is defined as information that a community provides to their members regarding convicted sex offenders in their area.  This can occur in two ways: the members of the community look up this information via sex offender registry website; law enforcement informs the community members a sex offender is moving to the area.[30]  This public information may not only affect their chances of finding employment, but also carries a significant social stigma,[31] especially for Mr. Weiss, who maintains strong community and professional ties.

Many sex offenders released into the community are faced with substantial stigma due to sex offender adjudication and classification under SORA.  Because of this they also face location of residence, financial challenges, as employment is often lost following a conviction.  Mr. Weiss' medical license will be revoked, and should he be sentenced to an extended period of incarceration, difficulty securing employment and regaining financial stability will be exacerbated.  Approximately 630,000 inmates return to their communities each year with

---

[28] Center for Sex Offender Management. (2008). *Fact Sheet: What You Need to Know About Sex Offenders* [Pamphlet]. Center for Effective Public Policy.
[29] US Department of Justice, Office of Justice Programs, Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking (SMART) (2012). *Sex Offender Registration and Notification in the United States: Current Case Law and Issues*.
[30] Center for Sex Offender Management. (2008). *Fact Sheet: What You Need to Know About Sex Offenders* [Pamphlet]. Center for Effective Public Policy.
[31] Ibid.

minimal resources and contacts to assist them in their search for employment.[32]  While finding a job for a formerly incarcerated offender is already difficult, being a sex offender poses an additional layer of difficulty for many reasons, including but not limited to employers being reluctant to hire sex offenders, the label of sex offender which requires a notice to the public, licensing restrictions with respect to doctors, nurses, and businesses, and zoning/residency restrictions that limit the geographic area where an individual can work.[33]

Mr. Weiss maintains a Physician Assistant license, which will be revoked, prohibiting him to resume employment in the medical field.  In one study, nearly 50% of the participants who were sex offenders on the registry reported losing a job while other studies found that almost 50% of sex offenders reported being denied a promotion at work due to their placement on the registry.[34]  This hardship not only affects an individual's income, but it affects the minimal housing options they have as different state laws mandating how far a sex offender can live within a certain distance from places where children gather.[35]

While unemployment can be a collateral consequence for an offender, being unemployed also has its own set of collateral consequences on the individual and immediate family.  Research has found that there is a strong association between psychological distress and being unemployed either due to being laid-off or unable to find a job, which then affects the economic instability.  If the psychological distress progresses to a diagnosable mental illness, the chances of the individual finding a new job are even slimmer.[36]  This period of time where the individual has insufficient funds to help them get through each day contributes to the individual's psychological

---

[32] Fredericksen, A., & Omli, D. (2016). *Jobs After Jail: Ending the Prison to Poverty Pipeline* [The Job Gap Economic Prosperity Series]. Seattle, WA.
[33] Center for Sex Offender Management. (2008). *Fact Sheet: What You Need to Know About Sex Offenders* [Pamphlet]. Center for Effective Public Policy.
[34] Ibid.
[35] Ibid.
[36] Mastekaasa, A. (1996). Unemployment and Health: Selection Effects. *Journal of Community & Applied Social Psychology, 6*(3), 189-205.

well-being and identity.  Income provides people with a means to control their lives and engage in spending and activities that provide them with experiences, roles, and social interactions, all of which are necessary for developing and maintaining one's identity and self-esteem.[37]   The additional collateral consequence the individual goes through is difficult to identify, address, and manage, while trying to financially survive in society.


**FINANCIAL IMPACT OF SEXUAL OFFENSE CONVICTION**

Mr. Weiss reported full-time employment with Orange Regional Medical Center, earning $145,000 annually.  He was employed per-diem at Good Samaritan Hospital in Suffern, New York, earning an additional $30,000 annually.  He further earned $35,000 in 5 months, working per-diem and overtime at Kingston Hospital.  He reported total monthly expenses totaling approximately $8,000, which includes rent, utilities, car payment, health insurance, credit card expenses and student loan payments.  Mr. Weiss reported a joint savings account that has a balance of $0, reporting his soon to be ex-wife removed all the funds.  There is reportedly a second savings account in only her name, which Mr. Weiss contributed to monthly.  He does not have access to any of that money.  After graduating college, Mr. Weiss had $150,000 in student loans.  He paid off $120,000 in 5 years, leaving $30,000 to be paid.

Since his arrest, Mr. Weiss has lost his position as a physician's assistant and will lose his license to practice.  Though Mr. Weiss is not in monetary debt, the loss of his job due to his incarceration will significantly impact his ability to continue paying his student loans and financial support for his child. Once released he will be labeled a sex offender hence will have a

---

[37] Waters, L. E., & Moore, K. A. (2002). Predicting self-esteem during unemployment: the effect of gender, financial deprivation, alternate roles, and social support. *Journal of Employment Counseling*, *39*(4), 171.

limited source of employment available to him and hence will have difficulty to afford basic daily living expenses.

**LONG TERM IMPACT DUE TO CHRONIC ILLNESS**

Chronic illness, as in the case of Mr. Weiss, was an aversive experience, impacting almost every aspect of an individual's life.  It is impacted by a range of factors, including past and current life conditions, personal characteristics, and contextual factors including stress.[38]  As a result, chronic illness is impacted by an individual's existing difficulties, available resources, ongoing responsibilities and activities, and personal goals.  These domains are further influenced by developmental context and are dynamic in nature.

Chronic illness is typically explored through either a stigma or normalization lens. When examined through a stigma lens, the focus is the way an individual suffers from the stigma of having a chronic illness.  Conversely, when viewed through a normalization lens, the focus is on ways in which an individual has achieved normalcy despite having a chronic condition.[39] Individuals diagnosed with chronic illness are tasked with navigating these seemingly oppositional lenses in a manner that allows them to cope with their illness.  Adolescents, when receiving chronic illness diagnoses during critical developmental periods, tend to struggle more as self-esteem is more dependent on the perceptions and behaviors of others, typically peers and family, as in the case of Mr. Weiss.  Adolescence is a markedly difficult development period and individuals navigate developing a more informed view of the self, forming relationships outside of the family context, and reaching for increased independence.  Receiving a chronic illness

---

[38] Karademas, E. C., Karamvakalis, N., & Zarogiannos, A. (2009). Life context and the experience of chronic illness: is the stress of life associated with illness perceptions and coping? *Stress and Health: Journal of the International Society for the Investigation of Stress, 25*(5), 405-412.

[39] Joachim, G. L., & Acorn, S. (2016). Living with chronic illness: The interface of stigma and normalization. *Canadian Journal of Nursing Research Archive, 32*(3).

diagnosis during this time can compromise the standard goals for this developmental period. Assimilating the factors that coexist with a chronic illness into a dynamic and still forming personality adds stress that an adolescent may or may not have the skills to cope with.[40]   Mr. Weiss has a lengthy documented medical history and reported increased difficulty in adolescence coping with the diagnosis of a blood clot and need for lifelong medication.


**INCONSISTENT MEDICAL TREATMENT WHILE INCARCERATED**

Mr. Weiss is fearful of other detainees at the two correctional facilities he was detained, primarily due to judgment from others, shameful of his actions and upon our interviews has expressed remorse. He reports witnessing multiple violent events while in detention in Westchester County Correctional Facility. He is most fearful that any physical altercation in his unit/housing area can expose him to injury, which could lead to loss of blood, that his body will be unable to control, due to his medical condition. He makes this assumption because he emphasized the lack of medical attention he may be able to receive to mitigate or stop the loss of blood.

In a meeting at Westchester Correctional Facility with Mr. Weiss on August 24, 2020, he reported continued difficulty receiving the appropriate medication for his blood clot (Factor V Leiden) condition.  He reported a recent International Normalized Ratio (INR) level of 3, with normal range between 2 and 3.  Due to the severity of Mr. Weiss' blood clotting condition, his INR level should be at a 1.  When he transferred from Metropolitan Correctional Center (MCC) and arrived at Westchester County Correctional Center, his prescription of Warfarin (Coumadin) was reduced from 15mg to 7mg.  On Wednesday August 19, 2020, his dosage was increased to

---

[40] Joachim, G. L., & Acorn, S. (2016). Living with chronic illness: The interface of stigma and normalization. *Canadian Journal of Nursing Research Archive*, *32*(3).

8mg and his INR dropped to 1.2.  On August 21, 2020 it was again increased to 15mg and his levels from this increase remained low.  There was a final dosage increase to 16mg and on September 10, 2020 his INR levels had returned to normal.  Mr. Weiss had a telehealth visit set up by the Westchester County Correctional Center with a hematologist who was unsure why there was any change to his medication dosage.  The hematologist confirmed with Mr. Weiss that his dosage should remain at 15mg and reported there would be a consultation with medical staff to ensure this.

In the last visit conducted Mr. Weiss noted that there has been sporadic compliance with medical plan that was previously set in place. He expressed great concerns about how BOP will be able to deal with his medical needs. Specifically, since it is critical that his blood levels remain in a specific range and his medication remains at a particular dosage, as there is an increased chance of sustaining another blood clot if they are not within range.

**CONCLUSION AND SENTENCING RECOMMENDATIONS**

As described in Mr. Weiss' detailed bio-psychosocial history, his life has consisted of multiple psychological, emotional limitations and trauma, related to chronic illness, bullying, sexual abuse, and lack of healthy socio-affective development.  These early experiences and factors have created distinct cognitive traits and pathologically shaped his persona.  Due to his early developmental limitations and obstacles placed before him, Mr. Weiss has impeded his ability to successfully progress through critical developmental stages.  He has developed a maladaptive set of coping skills to manage his emotions and has therefore not been able to cope with his worries and anxieties or process his childhood in a healthy manner.  When faced with a major life change, including a move away from home to a town where he had no social

39

connections, was isolated, and lonely, he became vulnerable, demonstrated a lapse in judgment and was ill-prepared to utilize healthier coping and problem-solving skills, resulting in the instant offense.

Despite Mr. Weiss' history and developmental disruption, he prides himself on being a man of good character and moral standing. He maintains respect, professionalism and integrity. He has been a committed and dedicated member of the many communities in which he has lived and worked, as evidenced by his plethora of awards, recognitions and accolades. He has volunteered his time and services to those in need since he was an adolescent, and entered the helping professions after college, demonstrating an interest in the well-being of others. His personality has never been self-centered, and he has always put the needs of others before his own. He has been emotionally stagnated by negative events and abuse during multiple stages of his life and has never allowed that to stand in the way of his desire to help others. It is clear that Mr. Weiss is an individual who is extraordinarily civic minded.

It is with conviction and the vast experience we have had with sex offenders in the criminal justice system that we believe Mr. Weiss is suffering the deep-rooted effects of chronic illness, trauma, and abuse, which has directly led to sexually acting out behaviors. It appears he has been seriously emotionally impacted by his experiences in sexual trauma, while ignoring his emotions, inhibiting his ability to develop age-appropriate emotion regulation skills. In addition, Mr. Weiss has struggled with poor self-esteem and loneliness, ever since he was school age, which may have embedded feelings of inadequacy and added to his social limitations.

To yield long term clinical gains and progress, we believe it to be critical that a re-entry plan include Mr. Weiss participate in specialized individual mental health treatment. It is essential for him to stabilize his mental health symptoms as they relate to the current arresting

incident.   Following stabilization, it is essential for him to focus on his deep-rooted emotional challenges, build a solid foundation of healthy coping skills and gain a deeper understanding into the current stressors impacting his optimal mental health.  Participating in mental health care and specialized sex offender treatment will ultimately allow him the ability to increase his distress tolerance and decrease his need to engage and utilize negative and criminally driven coping skills.   A minimal period of incarceration combined with probation supervision and specific sex offender intensive treatment will best meet the needs of providing long term solutions and the prevention of recidivism.

It is important to emphasize that the contents of the entire bio-psychosocial history and the character of Mr. Weiss are not intended to minimize the seriousness of the matter.  We do not intend on negating the alleged behavior that led to his arrest, but respectfully request that the Court consider the existing mitigating factors detailed in this memorandum and concur that an extensive period of incarceration is not intended for an individual with the character of Mr. Weiss.

The Consulting Project would like to thank the Court for its review and consideration of the contents in this memorandum and is hopeful that the it will concur with our recommendation.

Respectfully submitted,

*Mandi Budah*
Mandi Budah, MA, LCSW
Forensic Social Work Consultant

*Reynaldo Cusicanqui*
Reynaldo Cusicanqui, BA
Forensic Mitigation Specialist

EXHIBIT 1 –Character Reference Letters

Honorable Judge:

I am writing this letter on behalf of my son Jonathan Weiss, my name is Janet Rada-Mitchell I am his Mom, 58 years old and I live in Minersville, PA

Yes, I may seem biased when going forward however, Jonathan has faced and overcome so many obstacles in his short life eg. his health, losing his brother,
Having to be on Coumadin for the rest of his life due to a DVT at the young age of 17, the abuse he endured at such a young age that he held to himself, and many more.
But, because of his open minded and dedication to his plans, family and consideration of others he has succeeded. Jonathan has been the anchor for myself and our family since a very young age. His father left me for another man and Jonathan at the age of 7 just seemed to take over. He has and is so very compassionate of others and of community always volunteering and helping in anyway.

Jonathan and I talk almost daily which I am ever so grateful. We have been discussing and praying for the families involved as well as our family for all the pain this has caused them. He is ever so heartsick and greatly sadden of what this has done to the victims and there families as well as our family. And we are working toward the future together how he can be productive in society and succeed toward new goals of becoming the best at reconstructing his life working and contributing to society.

Since June I have gone through so many emotional times, I am so full of anxiety thinking I may not have the opportunity to help my son with his future goals as I am getting old and my mother is 86 years old who has been a staple in his life since birth.
Jonathan is my son I love and support him and respect all decisions and we will move forward in a positive way as we have been.

Thank you for your time and for all you do as a Public servant.

Sincerely,
Janet Rada-Mitchell

My name is Jessica Faust. I am Jonathan's younger sister, by two years. He is 30 and I am 28. From birth, Jonathan has always been a constant in my life. We grew up in the same house, ate at the same table every night, went to the same school, played with the same toys…we were close, we had to be. Jonathan and I were both very young when our parents divorced. I believe I was 3 and he was 4. Although some memories of that did not stick for me, some did. I remember when we moved out of the house they shared together, into a small row home in Minersville. It was small but we made it work. Some nights the three of us, Jonathan, my mom, and myself would sleep together when it was cold. We would play games, play outside..we made the best with what we had. Jonathan became the "man of the house". In some ways he was always more responsible than I was. Growing up, he always would be the one who got to drop off the bills to the post office, or be trusted to go to the bank and drop a deposit off in the box, walk home from school and to the bus stop alone. Jonathan was always a smart kid. Super book smart, I don't think I ever saw him study, like actually study with books for flash cards. He didn't have to, he would still ace every test. I on the other hand would be getting yelled at to do my homework or study. My mom taught me how to do the cooking, cleaning, laundry, household chores. Jonathan was never really good at any of the chores…or he made it seem that way so he wouldn't be asked to do them again! He was smarter than all of us really. He always had a comeback or a quick witted answer for everything…but he never talked back. When he was told no, he left it alone. I did not, I was always asking why or why not. I fought tooth n nail with my mom growing up. Jonathan never did. I often felt myself comparing me a lot to Jonathan. I always would say why do I have to do it and he doesn't or why cant I go but he can. He was older and yes more responsible in some ways, but he never really fought for anything when asking my mom.

My biological father would see us on some weekends but visits drifted into very little as we got older. Jonathan knew at an early age that our biological father was gay, I did not realize until I was much older. I think it had effected Jonathan more than myself. I think he was around 6 years old when he stopped wanting to see our dad. I would still visit him until I was 18. He emancipated both of us at the age of 18.  Neither of us had contact with him for some time now.

My step dad, Ed came into our lives around the time my biological parents divorced. I was a change at first to get used to of course, but Ed raised us, both me and my brother. Took us

in as his own and never looked back. Both of us would have never been able to be where we are today without him. It was a positive light in our world having him there to take care of us and our mom.

Jonathan was always very content at home, or at least he seemed that way. When he was younger he played with toys, army men, Lincoln logs, and the one I hated the most rubber bands..he would flick them at me every chance he could.. He liked to prank me, always setting up "boobie traps" into my bedroom or the bathroom. His mind was always going with something different to do or make the day go by. As he got older, he liked to play his video and computer games. I remember he would get a new game and have it beat in just a few days. He loved movies and TV. Living in smaller homes, we both spent a lot of time in our rooms, or in our little living room. He liked routine and timelines. Every day, for his whole life he followed routines. Same time to get up, get a shower, get breakfast, get to the bus on time, go to school, practice, come home and eat, shower and go to bed. This routine was mostly the day to day one throughout our high school days. He is very dedicated to plans and always was. He dealt with change but I knew he did not like it much. He hated being late anywhere. He would stick to a time schedule and follow it through!

Both he and I were always involved in extracurricular activities and sports. To this day Jonathan never liked to be stagnant. Always doing something. He was from a young age involved in sports. Basketball, baseball, and football. Jonathan has very bad allergies and asthma, which would make the sports thing difficult for him at times. He also struggled with his weight growing up, because of the steroids he was put on for his intense allergies. He never acted like this bothered him, he embraced the way he looked, but I know others weren't so accepting of it.

In school sometimes the other kids would poke fun at him for his weight, or because he was the last one to come around the track at practice. Hes a big guy 6'4, I know some kids were very hesitant with what they'd say to him, but others were not. He adopted the name Santa, due to him being a big guy who's cheeks would get bright red when hed have hard laugh or at practice. He happily embraced the name, and to this day Santa is the only name some know him by. Jonathan never acted like any of the bullying bothered him. Mostly because he would have a smart, quick witted remark to send back to them and they'd shut their mouth. Jonathan was popular in high school. We went to a very small high school. I only had 42 in my graduating

class, he had about 90 in his. Most of the kids we had gone to school with since pre-K. He always had a lot of friends. Because we went to a privet catholic school, most of the students were from different towns and boroughs in the county. So we were able to interact with kids from all over, not just where we grew up. When high school hit, Jonathan would always be out on the weekends with friends. Going to the movies, playing basketball, hangin out, playing video games. We had a small house but it was the house everyone always wanted to be at. He always seemed happy and content throughout high school. Rarely complained, I was the dramatic one!

Jonathan from the time he was about 5 always said he wanted to be a doctor. He loved watching ER, and surgery shows. He was always taking things apart and putting them back together and dissecting everything. My parents knew that he needed to get into a good college to succeed in his dream. Right from the first day of high school he was on the right track to becoming a doctor. He volunteered on the local ambulance for years as an EMT. He loved having his beeper go off and was always running to calls. He worked from the age of 12 at our grandfather's restaurant doing dishes. To working all throughout high school and summers home from college. He constantly was taking extra classes or courses to further his learning within the medical field. He was involved in many different clubs, and activities, even in the school play in high school and on homecoming court! In college he joined the fire house and became a firefighter as well as EMT. He liked to keep busy!

In college Jonathan started dating his first serious girlfriend. Cait and Jonathan dated from freshman year in college to marriage in 2016. She was the only person Jonathan really ever dated seriously. He went to every prom and has "dated" girls in high school but Cait was different. They became serious and from that point on that was his girlfriend until he proposed. Cait and Jonathan were a great couple. He only ever wanted to make her happy. He took care of her and loved her with everything he had. We saw how happy he was with her and the relationship and life they built. They didn't get to visit often after they got married and moved to New York. We would only see them on holidays or here and there, but Jonathan always said he wanted to come home more often, but he worked a lot.

All my life Jonathan just seemed content. He never really showed us his emotional side. Would we fight, of course wed fight were brother and sister. I have seem him with a temper here and here but nothing really standing out for me. He kept to self mostly at home, he would talk

about his days here and there but never really got deep into anything. At least with me. I was dramatic and talked about every aspect of my day..he would tell me my mouth didn't stop from the time id get home until I fell asleep. He was the quiet one with that. Growing up you sometimes don't realize the relationship siblings could have until you get older. You sometimes take it for granted…at least I did. Jonathan and I didn't get "closer" as far as a relationship where we could get through a conversation without calling each other names until we were both in college and after. It took us both a while to realize we were actually really good friends and not just siblings. We started to talk more regularly, sending texts here and there and keep in tough over facebook. We would talk when he would call my mom and I was there, which he does daily! Always did! Jonathan on the outside may not have presented himself this way…but he would give the shirt off his back for a stranger. I saw through the hard exterior he would sometimes put on, and knew that deep down he would do anything for me, or to help me. He always wanted to make people smile, give little gifts to others to brighten up their day.

I would have never known if anything deep down was going on with Jonathan. He always kept composure and never really let us know if anything was going on with him emotionally really. He seemed happy and content with everything. Would he mention if a class or if plans got changed and he was annoyed yes….or if I was annoying the crap out of him and getting on his nerves yes..but not really beyond that. Him and I did go through a lot growing up. We both had to see our mom raise us as a single parent really, and go through financial struggles while still trying to give us everything we needed and wanted. We were never without anything, we always had what we needed and did what we were able to do. He had to see his biological father choose another life over his own two kids, and deal with being emancipated at 18. Although he seemed okay on the outside, I am sure there was a lot going on on the inside that we would have never known.

Since all of this happened and my brother's incarceration, I have felt lost. Devastated and heartbroken yes, but lost. At the beginning I was depressed, empathetic and sad. My heart broke for him and the future he had built for himself. I jumped into action to be by his side because I knew he needed me. I was there for him, I comforted him, I talk with him when he calls. I tell him everything is going to be okay. Now that I know he is okay, and I can actually speak with him and see him, I am okay, but I am anxious every day. I know that life will never be the same

for our family. We will have to build from the ground up. Family gatherings will never be the same until he his home. Holidays, birthdays, Sunday dinners, now have to be met with anticipation of a phone call from him. The sadness and worrying won't go away. I told him I would never abandon him like I am sure he thought I would do given our relationship as brother and sister in the past was not super intimate and close. The people that matter in his life will be there for him. I love him, I miss him, I wish this would all just go away. Jonathan is a wonderful person, who yes makes mistakes, we all make mistakes.  I want the hurt to go away, especially for our mom. He asks me to take care of her every time we talk, and I do. I know deep down she is broken. I am just hoping for the best in all of this, just to have my brother back where he belongs.

Sincerely,

Jessica Faust

# EXHIBIT B



**Misericordia University**

By the authority vested in the Board of Trustees and upon
the recommendation of the Faculty

confers upon

**Jonathan Andrew Weiss**

the degree of

**Bachelor of Science**

Biology

with all the rights, honors and privileges pertaining thereunto.
In witness whereof, the seal of the University and the signatures
of the President and Dean are hereunto affixed.

Given at Dallas, Pennsylvania

This Nineteenth day of May, Two Thousand and Twelve.



*President*

*Vice President of Academic Affairs*



*Office of Admissions*

# MISERICORDIA
# UNIVERSITY.

February 24, 2012

Jonathan Weiss
205 North 5th Street
Minersville, PA  17954

Dear Jonathan,

**Congratulations**! Your application materials have been reviewed, and you have been selected to interview for the inaugural Physician Assistant program class of 2014. The next available interview date will be **March 13th**. Please respond back to Dave Pasquini in Admissions, either by phone or e-mail to indicate that you are accepting the opportunity to interview for the program. There will be several required meetings during the on-campus interview. You will be required to report to Insalaco Hall at 9:00 AM for a welcome reception and a formal presentation about the PA program. You will then be required to complete a writing sample and participate in two interviews. You will be interviewing with two faculty members and participating in an interactive exercise with two other candidates. The interview is an important part of the admissions process.

It is highly recommended that you research the PA profession and be prepared to answer questions about the function of the PA and some highlights about the profession itself. The interview process will last until early afternoon.  There will be an opportunity to tour the campus after the interviews conclude.

After the interview process, the Admissions Committee will consider each candidate and decide whether or not to offer a seat in the program. This action will be communicated to the candidate within two weeks of the interview date.  Please understand if you are offered a seat in the program and still have outstanding prerequisite requirements, your admission status will be considered a conditional admission. If you do not complete all requirements prior to matriculation, your seat will be forfeited to the next available candidate.

I look forward to seeing you at the next interview day.  We know you will be challenged by the Misericordia University Physician Assistant Program, but you will find it a highly gratifying experience.

The faculty of the Misericordia University PA program look forward to meeting you on March 13th.  Please contact us at any time with any questions you may have about the program and your participation in it.

Best wishes,

Scott Massey, PhD, PA-C
Professor of Physician Assistant Studies
Founding Department Chair and Program Director
Misericordia University
301 Lake Street
Dallas, PA 18612-1090

David Pasquini
Assistant Director of Admissions/Transfer
Misericordia University
570-674-6255
dpasquin@misericordia.edu



*Certificate of Excellence*

By Virtue of Superior Academic Achievement
During the Spring 2011 Semester

# Jonathan Weiss

Has Earned a Place of Honor on

## The Dean's List

And this Certificate of Excellence is Awarded
In Testimony Thereto



**MISERICORDIA
UNIVERSITY**

Mari P. King, Ed.D
*Vice President of Academic Affairs*



*Certificate of Excellence*

By Virtue of Superior Academic Achievement
During the Fall 2011 Semester

## Jonathan Weiss

Has Earned a Place of Honor on

### The Dean's List

And this Certificate of Excellence is Awarded
In Testimony Thereto



**MISERICORDIA**
UNIVERSITY.

Mari P. King, Ed.D
*Vice President of Academic Affairs*

# Misericordia University
# Service-Learning Center

This certificate is awarded to

## JONATHAN WEISS

For the completion of community service as part of

## PHYSICIANS ASSISTANT 526



*Brenda Nowalis*

Director, Service-Learning Center

Fall 2012

Date

# Beta Beta Beta Biological Society



*This certifies that*

**Jonathan Weiss**

*has been made an associate member in recognition of
an interest in biology and willingness to participate
in the activities of*

**Nu Rho**

27 April 2012

Date

National President

# Emergency Management Institute



# FEMA

This Certificate of Achievement is to acknowledge that

## JONATHAN WEISS

has reaffirmed a dedication to serve in times of crisis through continued professional development and completion of the independent study course:

**IS-00100.b**
**Introduction to Incident Command System**
**ICS-100**

*Issued this 31st Day of August, 2015*



Tony Russell
Superintendent
Emergency Management Institute

0.3 IACET CEU



NEW YORK STATE

# STATE OF NEW YORK

## FIRE TRAINING CERTIFICATE

*This is to attest that*

### Jonathan Weiss

*is hereby awarded this certificate signifying the completion of*

### Basic Structural Collapse Ops

*in the standardized fire training program, totaling* **8** *hours of instruction.*

*Attained this date* **January 21st, 2017**

**Governor**
**State of New York**

EXCELSIOR

*Carl Houman*

State Fire Instructor
Office of Fire Prevention and Control



NEW YORK STATE

# STATE OF NEW YORK

## FIRE TRAINING CERTIFICATE

*This is to attest that*

## Jonathan Weiss

*is hereby awarded this certificate signifying the completion of*

## Trench Rescue - Awareness

*in the standardized fire training program, totaling* 8 *hours of instruction.*

*Attained this date* **January 22nd, 2017**

EXCELSIOR

Governor
State of New York

*Neal Russell*
State Fire Instructor
Office of Fire Prevention and Control



## STATE OF NEW YORK

## FIRE TRAINING CERTIFICATE

*This is to attest that*

### Jonathan Weiss

*is hereby awarded this certificate signifying the completion of*

### Firefighter Survival

*in the standardized fire training program, totaling* **9** *hours of instruction.*

*Attained this date* **March 13th, 2016**

Governor
State of New York

*Jamie Rohner*

State Fire Instructor
Office of Fire Prevention and Control



## STATE OF NEW YORK

# FIRE TRAINING CERTIFICATE

*This is to attest that*

**Jonathan Weiss**

*is hereby awarded this certificate signifying the completion of*

**Firefighter I (1S-1622)**

*in the standardized fire training program, totaling* **104** *hours of instruction.*

*Attained this date* **December 17th, 2015**

Governor
State of New York

State Fire Instructor
Office of Fire Prevention and Control

EXCELSIOR

# Orange County District Attorney's Office

*Congratulations to*

## Jonathan Weiss

*on becoming a*

## Firefighter

*Mechanicstown Fire Department*

*December 17, 2015*

_____

DAVID M. HOOVLER
*District Attorney*

# Orange County Sheriff's Office

# Certificate of Recognition

## To

## *Jonathan Weiss*

### MECHANICSTOWN FIRE DEPARTMENT

## This 17th day of December, 2015

    

Carl E. DuBois, Sheriff



opens session

Walker said:                    The victim was able to free him-       Shortly after 911 alerted po-    kout for the Ford, a  Wilkes-      See C

iam S. Marshall Jr.,
of St. Stephen's Epis-
ilkes-Barre, gave the
e state House of
legislative session

Marshall was the
guest of state Rep.
Phyllis Mundy,
D-Kingston, who is a
member of St. Ste-
phen's Church.
"It was my honor
and privilege to have
Reverend Marshall
as a guest today,"
e had the full legisla-
a tour of our beautiful
g caucus and sitting in
out budget issues. I
l his visit as much as I
him here."
g Marshall was the
Simmons, rector at St.
elds Episcopal Church
p.

roundtable set

, Region III director of
an Services, will
roundtable discussion
e Care Act starting at 3
r at the Kirby Health
nklin St.
being coordinated with
the Pennsylvania
Health Access Net-
work, the Wilkes-
Barre Peace and
Justice Center and
the NEPA Area
Labor Federation.
The event is one
of 50 "House Calls
for Health Care"
s the state during the
lth care reform law's
ary.
eak at 11:30 a.m. at the
Center, 680 Wyoming
on free preventive
o seniors and other
w. For more informa-
nt, call Brenda Lispi at
33 or Sandy Acornley

roup will meet

rned Wilkes-Barre
Association will hold
eting on Tuesday, April
: St. Andrews Parish,
All city residents are
ttend.
rmation, visit
reTaxpayers.com.

on recycling



PETE G. WILCOX/THE TIMES LEADER

Misericordia biology students, from left, Lawrence Paddock, Nicholas Sulzer and Jonathan Weiss wade out into Bow-
man's Creek in Wyoming County on Monday to demonstrate how they collect data for their study.

# Checking up on creek's health

**MU students assess drilling water
withdrawal's impact on Bowman's.**

By TOM VENESKY
*tvenesky@timesleader.com*

EATON TWP. – Misericordia Univer-
sity senior Jon Weiss often wondered if
the pumping stations used to remove
water from Bowman's Creek for gas
drilling were having an impact on the
waterway.
Sure, Bowman's Creek is quite large,
he said, but if there's an impact it should
be identified.
Last summer and fall, Weiss and fel-
low biology students Nick Sulzer and

Lawrence Paddock set out to determine
if the makeup of the creek changed
above and below the pumping stations.
They did the work for their senior pro-
ject under the guidance of Barbara
McCraith, Ph.D., associate professor of
biology at Misericordia.
"Gas drilling is still relatively new
and there aren't a lot of studies on every-
thing involved," Weiss said. "We chose
this stream because of the pumping sta-
tions. It would be a good indicator if
there are any impacts."
They chose to study Bowman's Creek
because it is close to the Back Mountain
campus and is stocked with trout by the
Pennsylvania Fish and Boat Commis-

sion, making it a popular destination for
anglers.
McCraith said the project isn't aimed
at stopping water withdrawal, but to de-
termine if better regulations are need-
ed. The first step, she said, was to deter-
mine if the flow of the stream or its
makeup, including water chemistry and
macro invertebrate life, changed signif-
icantly above and below the water with-
drawal sites.
From May through November, the
trio of students visited the creek every
two weeks to take samples. They mea-
sured the base flow, total dissolved sol-

See CREEK, Page 9A

# W-B takes up the banner of decoration

**City starts hanging banners
that celebrate Wilkes-Barre
history on streetlights.**

By BILL O'BOYLE

people and a community.
The Streetlight Banner pro-
gram fulfills that mission."
About 10 banners, which
cost $150 each and were paid
for by city businesses, were
hung, and Leighton said



Sheriff depu
cused into
thouse on M

# Plea
in H
deat

Angel Sanch
Rodolfo Pere

By SHEENA D
*sdelaxio@time*

WILKES-B
in the death
ary 2011 plea
lated charge
hear the case
stabbing the

Angel Sanc
ed guilty to a
third-degree
the Jan. 16 d
year-old Vlad
outside a city

Rodolfo H
rez, 25, also
ton, will face
charges of
homicide an
attempt this
men and eigh
ternates, wer

Attorneys
ments this m
gins in the c
Perez and
Hazleton p
Green Street
port of two
near Penn P

Police foun
and stab wo
Hope, of Ha
shot wounds
Valley Hospi
lice say Hope



ACADEMICS

# Area creek subject of research

**from page 17**

Jonathan Weiss '12, '14, as part of their senior research project, decided to examine if the health of Bowmans Creek was affected below the pumping stations due to the withdrawal of water.

"I am looking at a career in the environmental science/ecology field and have conducted many small-scale stream assessments in the past," says Sulzer. "I enjoy working with steam ecosystems. When looking for a topic of research, we came across the surface water removal and thought it would be an interesting and very current issue."

"We chose this project because it was real field work and was relevant to what is happening in our backyards," adds Paddock. "Everyone has strong opinions on the gas wells being put in place, but until real data has been collected and examined for many years, we will not truly know the impacts on our stream health and water supply."

Student researchers, under the direction of Barbara McCraith, Ph.D., associate professor of biology, chose two locations upstream and downstream to conduct their study and began collecting their data in May 2011. Measuring 20 meters along the shore and extending across the width of the creek, students collected data on water temperature, dissolved oxygen, pH level, flow rate, specific conductance, and ammonium and phosphate levels. Through kicknetting, they also gathered macroinvertebrates, such as mayflies, stoneflies and caddisflies, because the organisms are important indicators of



Misericordia University biology majors, from left, Jonathan Weiss '12, '14 of Minersville, Pa.; Nicholas Sulzer'12 of Lehighton, Pa., and Lawrence Paddock '12 of Millerton, Pa., collect data for their scientific study and senior research project.

stream health. "There has not been any research done on something like this as far as I am aware of and I feel it is a really neat subject to examine," says Weiss. "The scientific community is calling for numerous amounts of research to be conducted surrounding the natural gas industry and the impacts on the environment."

Overall, the research was the first step in a long process to measure what, if any, impact water withdrawal can have on a stream like Bowmans Creek. Students acknowledge it's a process that could take years of data collection to reach a proper, scientific conclusion. In this case, data collection was delayed by the historic flooding in the fall and it limited students to nine data collection dates, which prevented them from drawing any conclusions. The preliminary data that was collected, though, showed no major differences between the upstream and downstream sites, the students said.

"We conducted the study to the best of our ability, but nature didn't cooperate with us," adds Sulzer. "We learned valuable lessons: How to design and carry out the experiment, and how to

gather the data and how to present it."

The next step in the study, according to the students and Dr. McCraith, is to have another group of MU students continue their good work in the fall. It is important to consistently monitor the stream's health during the natural gas drilling boom and it also offers students a chance to experience field research.

"It is a great opportunity to get hands-on experience in so many fields of biology," says Paddock. "It is also important in learning the proper way to do research. Since it is a sensitive topic where so many people have extremely biased opinions, it's a great way to practice unbiased research."

Students also presented their findings at the 88th Annual Meeting of the Pennsylvania Academy of Science in Allentown, Pa. "I am proud of our students because they tackled a new and emerging environmental issue in rather difficult circumstances," Dr. McCraith says. "The flooding prevented them from completing their data collection, but they tackled a project that had never been tackled before and gained invaluable field experience."

## Fast Facts:

Misericordia University student researchers utilized some of the following equipment to monitor the health of Bowmans Creek in Wyoming County, Pa.:

1. Kicknet
2. Meter stick
3. PASCO GLX data logger
4. Flow meter
5. Colorimeter
6. Collection jars



Misericordia student researchers, from left, Lawrence Paddock '12, Nicholas Sulzer '12 and Jonathan Weiss '12, '14, collect data on water temperature, dissolved oxygen, pH level, flow rate and specific conductance from Bowmans Creek by using the PASCO GLX data logger.

MISERICORDIA TODAY

SUMMER 2012

16



SERVICE

Misericordia University students volunteer and work at the Dallas Fire and Ambulance Department (DF&A) to give back to their adopted hometown community. Participating as emergency responders with DF&A, atop fire apparatus from left, are James Miller '11, '14 of Ashland, Pa.; Shawn McArdle '13 of Nesquehoning, Pa.; Suzanne Nowalk '12 of Hop Bottom, Pa., and Jonathan Weiss '12 of Minersville, Pa., as well as DF&A President Mark Van Etten '93, below.

12

Case 3:21-cr-00449-RMP    Document 47    Filed 01/01/22    Page 83 of 114



**Adam Bahrey**

Mahanoy Area Middle School student of the month

...mberly ...ughlin

...anoy Area ...dle School ...dent of the ...month

...s Against ..., the latter ...resident.

... Special ...e football ... plans to ...ering at ..., Bethle-

**...iddle**

...ghlin and ...re named ...onth for ...aculty of ... Middle ...m is spon-...anoy City ...Protective ...ge 695.

...tinguished ...involved in ...rea High ...nd concert ...unior Hon-...Print, ski ...tball, biddy ...venth- and

eighth-grade cheerleading and Mahanoy Area swim team.

A daughter of Dennis and Cindy Loughlin, Mahanoy City, she is a member of Blessed Teresa of Calcutta Roman Catholic Church, Mahanoy City, where she is a greeter. Her future plans are to attend college and major in architectural landscaping.

Adam, an honor student, is involved in cross country, chorus, Mahanoy Area High School marching and concert bands, National Junior Honor Society, ski club, Theatre Arts, jazz band, track and field and intramural hockey.

He is a son of Eugene Bahrey, McAdoo, and Mary-Beth Evanco, Barnesville, and a member of St. Peter's United Church of Christ, Barnesville. His future plans are to attend college and major in engineering.

...haven, was attending ... dean's list at Cornell University, Ithaca, N.Y., for the fall semester.

A 2011 graduate of Blue Mountain High School, he is a son of Tom and Lori Maley, Schuylkill Haven, and a grandson of George and Helen Barnes, Saint Clair.

## West Chester

**Lauren Nicole Dukmen,** Pottsville, who is pursuing a bachelor's degree in chemistry/biology at West Chester University, was named to the dean's list for the fall semester.

She is a daughter of John and Rosalyn Dukmen.

## Seton Hall

**Elizabeth Lauren Witman,** a freshman speech and language pathology major at Seton Hall University, South Orange, N.J., made the dean's list for the fall semester.

She is a daughter of Robert and Gretchen Witman, Pottsville, and a 2011 graduate of Nativity BVM High School.

## Misericordia

**Jonathan Andrew Weiss,**

...ge 88 of an accounting major; **Sarah Lee Ney,** Pine Grove, a business technology support major; **Ruth Ann Altman,** Pitman, an anthropology/archaeology major; **Jillian Grace Fellows,** a psychology major, **Patrice Mary Minder,** majoring in hospitality management, **Monica Claire Orlosky,** majoring in speech-language pathology and audiology, and **Samantha Michelle Wood,** a music performance major, all of Pottsville; **Samantha M. Gubala,** Ringtown, majoring in physical education and sport/exercise science; **Brittany Lee Gilroy,** a criminology major, and **Kathryn Marie Smith,** majoring in management/general, both of Shenandoah; **Murphy Katelyn Bennett** and **Kerri Lynn Hegarty,** both majoring in deaf education, both of Tamaqua; **Jeremy Joshua Hartley,** a journalism major, and **Jessica Lynn Ritzman,** majoring in clinical laboratory science, both of Tower City; **Jeremiah Levi Umholtz,** Valley View, a music education major.



SUBMITTED PHOTO

...remonies at ...berly Jones, ...Natale, Star ...ckie Enders, ...z; third row, ...ndra Davies, ...yler Seiders, ...dam Ould.



SUBMITTED PHOTO

# NS inducts 35 into honor society

The North Schuylkill School District inducted 35 new members into its National Honor Society at 7 p.m. March 1 in the high school auditorium. They include, from left, front row, Vanessa Burns, Taylor Budwash, Amanda Boyer, Kayla Bolinsky, Amanda Anthony, Elizabeth Antanavage, John Rittle; second row, Courtney Gregas, Matthew Gownley, Michaela Fetterolf, Staci Fetterman, Shannon Evans, Danielle Detweiler, Jenna Caso; third row, Ashley Morgan, Anthony Marone, Nicole Lloyd, Josh Howard, Amanda Howard, Felicia Holderman, Blair Hetherington; fourth row, Kyrsten Runkle, Kendra Rockwell, Larissa Ressler, Dominique Reinoehl, Mallorree Peters, John O'Keefe, Ethan Motsney; fifth row, Hannah Whitecavage, Pat Walsh, Nick Vivacqua, Jordan Troutman, Sarah Stepanchick, Brendan Shearn, Justin Sharp.

# MU students do so much more than attend classes

**Students give back to community by volunteering their time and expertise.**

*Special to The Dallas Post*

What is a community? It's an ambiguous question, but the answer can define a region for better or worse.

Take James Miller, for example. He's an active member of several communities - at Misericordia University, in Ashland and at the Dallas Fire and Ambulance Department (DFA).

He's "not out to save the world" as an emergency responder, he acknowledges, but he does believe he should use the skills he's acquired as an occupational therapy student, volunteer firefighter and emergency medical technician (EMT) for the betterment of others.

It's a common theme among many collegians on the campus of Misericordia University.

They give their time tutoring school-aged children, raising money for worthwhile charities or by simply working to raise awareness about important issues. For Miller, an Ashland native, and his fellow MU students and colleagues, Suzanne Nowalk, of Hop Bottom, Jonathan Weiss, of Minersville, and Shawn McArdle, of Nesquehoning, their community is defined by the assistance they provide to people while responding to emergency calls as members of the DFA.

The town-and-gown relationship is obvious on the upper and lower campuses of Misericordia University, but especially outside the student residence halls. Working with

**Working with the university's administration, Mark Van Etten director of budgets and accounting at MU and president of the DFA, had special parking signs erected for the student volunteers to make it more convenient for them to respond quickly to emergency calls around the clock.**

the university's administration, Mark Van Etten director of budgets and accounting at MU and president of the DFA, had special parking signs erected for the student volunteers to make it more convenient for them to respond quickly to emergency calls around the clock.

Besides volunteering, the students also fill shifts that are available. The relationship reduces the department's overtime budget and also provides a stipend the students can use to offset the cost of their education. In 2011, students responded to 200 emergency ambulance calls in the community and earned about $9,000 collectively. They also participated in 454 response calls for the fire department, many of them when they mattered most.

"Without our student volunteers, we would have manpower shortfalls, particularly during the daytime hours which would leave a void in public safety in the community," says Van Etten, who also volunteered with the DFA when he was a student at MU. "Overall, student involvement over about the last seven years has put us in a position to increase our ambulance license from basic life support to advanced life support. Our ambulances



Misericordia University students volunteer and work at the Dallas Fire and Ambulance Department (DFA) to give back to their adoptive hometown community. Participating as emergency responders with DFA, atop fire apparatus from left, are James Miller, Ashland; Shawn McArdle, Nesquehoning; Suzanne Nowalk, Hop Bottom; and Jonathan Weiss, Minersville, with DFA President Mark Van Etten, below.

are staffed with paramedics who are able to administer medicine and we now have more advanced heart monitors for heart attack and stroke patients.

"Thanks to the quality of Misericordia's student volunteers we are able to provide the community with a higher level of medical care," Van Etten added.

The value of the students' service was never more evident than last fall when Hurricane Irene and Tropical Storm

Lee caused millions of dollars in damage to homes and infrastructure in regional communities, and resulted in countless others being evacuated to higher ground. Like many residents, Misericordia's student responders answered the call. They pumped out basements, assisted evacuees and helped cleanup from the aftermath.

"There was such a great need for assistance in the Back Mountain and very few people to provide assistance,"

recalls Miller, who joined the DFA in 2007 and has been a volunteer firefighter with the Washington Fire Co. Community Ambulance since 2005. "The response from Misericordia was very impressive, during and after the flooding. During the evacuation of the Wilkes-Barre area, I was given the task to help set up the evacuation shelter at Dallas High School. I made several phone calls to a few of my friends at Misericordia and we soon had over 20 people who

came out to help set up."

"It (volunteering) is a wonderful feeling," adds Nowalk, who is also a private first class in the Pennsylvania National Guard and volunteers with the Hop Bottom Hose Co. "I was amazed during the flood to see the people pouring into the Dallas Middle School to drop supplies off. It really helped me appreciate and be proud of my adoptive community."

It also seems natural for these Misericordia students to volunteer at DFA. After all, they each majored in an occupation that strives to make the world a better place for humankind. Miller earned his undergraduate degree in psychology and is working toward his master's in occupational therapy. Weiss majored in biology with a minor in chemistry and will begin his graduate studies at Misericordia in the fall as a physician assistant student. McArdle is a psychology major and Nowalk will earn her Bachelor of Science degree in nursing in May.

"I do it (volunteering) because I care and it is a calling," says Nowalk. "I have always felt that if I cannot put my time in to help someone else, how can I expect someone else to take their time and help me?"

"Giving back to your community, whether it's your hometown or your adoptive community, really instills a feeling of satisfaction in you," says Weiss, an EMT since 2008 and a member of the DFA since 2010. "You feel good knowing that you were able to help someone in some way and you know it means a lot to them. Being a member of DFA has also allowed me to become more integrated into the community."



Mile in Her Shoes' events."

For more photos see the
Viewfinder on page 2.

PHOTO BY SHANA WEINSTOCK / THE HIGHLANDER

*Above, Dr. Patrick Hamilton and Dr. Allen Austin donned red high heels to walk in the fundraising event on March 26.*

# Some on-call for more than just homework

**Students volunteering as Emergency Medical Technicians have cause for special parking treatment - they save lives.**

By Audra Wehner
*Reporter*

Junior Jonathan Weiss's Emergency Medical Technician (EMT) pager can go off at any time, day or night. The pager will sound and he then has five to seven minutes to get dressed, rush from his dorm to his car and arrive at the firehouse. Each passing second may be the difference between a person's life and death. MU students Jonathan Weiss, Shawn McArdle and Jim Miller say they couldn't imagine their volunteer work with local fire departments any differently.

The students say that they are expected to report to work in a matter of minutes and it can be difficult, especially when living on campus.

"Everyone knows how horrible at times parking can

be and sometimes I ended up closer to Alumnae [Hall] when I live in Gildea [Hall]. This was a huge problem for nights when I was on call --to wake up, get dressed and run halfway across the parking lot just to get to my car was a serious issue. Especially when someone's life could depend on a matter of seconds. It really started to concern me as the weather worsened," said Weiss.

Weiss said he proposed reserved EMT/Volunteer Firefighter parking last semester for students like himself, McArdle, and Miller. Sr. Jean Messaros, Vice President of Student Affairs and Director of Mercy Integration, and Robert Zavada, associate director of Campus Safety, supported

this idea. This semester they installed parking signs for the EMT students, so they could have convenient parking right outside their dorms for quicker response time to their calls.

The students say that volunteering as an EMT and firefighter is a positive experience. "When the pager goes off the adrenaline starts to kick in, my heart starts to race. I start getting in the mindset of what is going to happen and what I have to accomplish," McArdle said.

The volunteers are now assured that when their pagers sound, they won't have far to run in order to get to their vehicles.

Jonathan Weiss has been an EMT for the past five years and got started in the field because he was interested in medicine. He hopes to go to medical school after graduation.

James Miller, volunteer firefighter and EMT worker, has been in this line of work for the past five years. He wanted to join after his father became involved in the fire department.

Shawn McArdle is a volunteer firefighter of five years and an EMT for three years. His family tradition played a role in his becoming a firefighter and EMT. His father, John, is the Fire Chief for Nesquehoning Hose Co. #1, his brother Brendan is the Lieutenant there, and two of his uncles are active members.



RESERVED PARKING
Dallas Fire Department
On-Call EMT

PHOTO BY AUDRA WEHNER / THE HIGHLANDER

"I'm a survivor" echoed during RELAY for LIFE

*Exclusively on highlandernews.net*

# Inside

**RECIPE FOR DISASTER:** Can an onion not make you cry?    PAGE 3

**LET'S TALK FASHION:** In this style file, two of a kind can beat a full deck of cards    PAGE 3

# EXHIBIT C



# TIME

## Can Bad Men Change? What It's Like Inside Sex Offender Therapy



Kevin, who was convicted of indecent exposure, during a counseling session on May 1    Mike Belleme for TIME

BY **ELIANA DOCKTERMAN**

UPDATED: MAY 14, 2018 4:14 PM ET | ORIGINALLY PUBLISHED: MAY 10, 2018 7:00 AM EDT

T he men file in, a few wearing pressed button-down shirts, others jeans caked in mud from work on a construction site. They meet in the living room of an old taupe bungalow on a leafy street in a small Southern city.

Someone has shoved a workout bike into the corner to make room for a circle of overstuffed chairs dug up at the local Goodwill. The men jockey for a coveted recliner and settle in. They are complaining about co-workers and debating the relative merits of various trucks when a faint beeping interrupts the conversation. One man picks up a throw pillow and tries to muffle the sound of the battery running low on his ankle bracelet, a reminder of why they are all there.



Every one of the eight men in the room has been convicted of a sex crime and mandated by a court to see a therapist. Depending on the offense, their treatment can last several months or several years. (TIME has given both the men and the therapists pseudonyms in this story.)

They sit in the circle, the man who exposed himself to at least 100 women, next to the man who molested his stepdaughter, across from the man who sexually assaulted his neighbor. The group includes Matt, whose online chats led to prison; Rob, who was arrested for statutory rape; and Kevin, who spent decades masturbating next to women in movie theaters.

Some of the men's crimes aren't all that different from the allegations against public figures such as Kevin Spacey, Bill Cosby, Harvey Weinstein and Roy

Moore. Unlike the famous men, they cannot afford lawyers to draft nondisclosure agreements, or arrange hush-money payments, or appeal guilty verdicts, as Cosby's attorneys are planning to do following his conviction on sexual assault in April. (Cosby could also be ordered to seek therapy.) Nor can they attempt to stage professional comebacks or publish mea culpa memoirs.

Instead, these men were all found guilty and had their names added to a state sex-offender registry. They will remain on that list for decades and, in some cases, the rest of their lives. Anyone can search online for the ugly details of their crimes, including employers, partners and their own children. A judge has limited where most of the men in this room can live, work and socialize—and whether they can access the Internet. Some are unemployed, and many live paycheck to paycheck, dependent on the few employers who are willing to tolerate their criminal history.

The more than 800,000 registered sex offenders in the U.S. may feel that their parole restrictions are onerous, but the mere presence of a known offender in almost any community precipitates clashes of competing interests and legal battles that have only intensified in the wake of the #MeToo movement. In at least 10 recent lawsuits filed in states from Pennsylvania to Colorado, civil rights proponents argue that sex offenders face unconstitutional punishments that other criminals do not, and they note that there are no government registries for murderers or other violent felons in most states. The Supreme Court is scheduled to hear a case challenging the limits of the registry in its October term.

But advocates for the millions of women, men and children who have experienced sexual violence are pushing back on any reforms, and 12 states have passed or proposed further restrictions on offenders in the past year. "What most of my clients want is their attacker gone," says Lisa Anderson, a lawyer who represents survivors of rape. "If I could brand them with a scarlet letter on their forehead I would, because I don't want any woman hurt like that again."

Most people find it difficult to reconcile the hope that rehabilitation is possible with the impulse to push these men to the periphery of society forever. Punitive measures alone, however, have not been found to meaningfully increase community safety. Meanwhile, therapy–when paired with tough parole restrictions–can significantly reduce the chance of re-offending, according to the American Psychological Association. "It's hard for me to believe that someone could violently ignore the will of another and then be taught not to cross that line," says Anderson. "But if it's possible to teach them empathy, then that should be mandatory."

There are about 2,350 therapists across the nation who provide court-mandated treatment to sex offenders. (Counseling is also offered through prisons and other government institutions.) Judges refer the offenders to psychologists or clinical social workers who are authorized by states. In some cases, the government subsidizes the cost of treatment. Private therapists can refuse to see certain patients at their discretion.

Cheryl, a clinical social worker, and Jennifer, a licensed professional counselor, oversee the weekly meetings in the bungalow. They have worked with both victims and perpetrators for almost 20 years. They do not have to accept all referrals from the state—-and they say there are certain men they simply won't treat, such as those who repeatedly prey on children, and seem unwilling to change. But they say that by the time most of their patients leave therapy, they are equipped to take responsibility for their actions, to understand what led them to commit their crimes and, finally, to empathize with their victims. "Working with these men and watching them change actually gives me hope for all men," says Jennifer. "Because if people can't change and grow, well, then what are we going to do with all these bad men in the news, with all the bad men who are still out there?"

**Unable to silence the ankle bracelet,** Cheryl and Jennifer decide to start the session despite the distraction. "The topic on the table today," Cheryl says, "is how we failed ourselves and others and how we hold ourselves accountable for that failure."

Matt, 30, grips a pillow on the couch as he recounts his story. He had always had trouble talking to girls. He would lose track of his words and fidget. In high school, he turned to chat rooms where nobody could see his awkward mannerisms. He started skipping class and parties to talk online. The conversations fueled his sexual fantasies.

"It led to a devaluation of whoever was on the other side," he says. "They weren't a person. They were a means to an end. I never actually hurt anyone physically. But I left an emotional holocaust."

He met his fiancée not in a chat room but at college. He was studying political science in the hopes of becoming a lawyer and maybe, someday, a Senator. He aspired to higher office, he says, "'cause nobody is going to say: A United States Senator? What a f-cking loser." He says doctors diagnosed him with everything from ADD to depression to borderline personality disorder. (Jennifer believes that Matt is somewhere on the autism spectrum.)

Even while in a relationship, Matt continued to linger in chat rooms. When he was 26, he met what he thought was a 14-year-old girl online. He had been arguing with his fiancée, but this girl laughed at his jokes and spent just as much time in front of the computer as he did. After the chats became sexual, she asked to see him in real life. Eventually he agreed to meet her at a Walmart across town from his job.

"I get there, and there's nobody there. I'm excited. I'm just like, 'Nothing bad can happen now. I can go back to work where I'm supposed to be,'" he says. "Not two seconds later I see these blue lights, and hear, 'Police. Get on the ground.' Turns out [the 14-year-old] was a police officer the whole time."

The consequences were swift. Matt went to prison for 11 months. He lost his career and fiancée. He now works a job in construction that he says he hates.

As Matt recounts his story, Jennifer cuts in to ask him how he justified having a sexual conversation with a teenager in the first place. "I thought, At least I'm not touching her," Matt says. "I didn't think of a 14-year-old as a child. I

thought of myself at that age being highly sexualized. I thought everyone was, or at least everyone was pretending to be."

"O.K., S-T-O-P," Jennifer interrupts. "That's a cognitive distortion, right there."

A sex offender, Jennifer later explains, often commits a crime by rationalizing it in some way: she wanted it, or my needs mattered more than hers. They convince themselves that a false notion is true–a cognitive distortion. Therapists' work often consists of challenging their clients' false beliefs and encouraging them to develop a more realistic view of the world.

**There isn't one standard method** for treating sex offenders. But many experts have come to agree that identifying motivations and thought patterns is essential. Still, some therapists favor a much more confrontational method. "I saw treatment providers shaming and demeaning people, and literally having people get on their knees and say, 'I'm f-cked up. I'm f-cked up. I'm f-cked up,'" Cheryl says. "I would much rather reach out my hand and say, 'Let's talk about how f-cked up you are.'"

Recent research published by the American Public Health Association suggests that focusing on punishments rather than positive goals can actually increase the chance of recidivism. In 2006, the Department of Justice endorsed more progressive methods such as the Good Lives Model, which aims to teach people how to fulfill their emotional and physical needs without hurting others. That includes challenging sexist behaviors and skewed social views that lead them to hurt other people.

In one group session, Cheryl and Jennifer pose a scenario meant to do just that: a man walks into an office, and a female receptionist smiles at him. Should he ask her out on a date? Two 50-something men in the group say they've always assumed every time a woman smiles or wears a short skirt, she's coming on to them. One of the men in his early 30s argues that the receptionist has to be friendly to do her job. Jennifer points out that the receptionist is in an impossible position: if a valued customer hits on her, she may fear that she'll be fired if she rejects him.

After each weekly discussion, Cheryl and Jennifer give homework assignments, such as asking participants to fill in a timeline of high and low moments in their lives, or writing a statement from the perspective of their victims. Lately, they have asked their patients to discuss the dozens of men who are making headlines for alleged sex crimes.

Matt watched the trial of Larry Nassar, the USA Gymnastics doctor who was sentenced to up to 175 years in prison for molesting more than 160 women and girls. "The prosecutor was calling him a menace to society, and I'm like, Yeah, that guy is a menace to society," says Matt. "But the lawyer in my case was using the same phrase about me. I'm not claiming I'm some great guy or whatever, but I didn't use my power to hurt [hundreds of] people."

The consensus in this group, which includes men who trafficked in child pornography and men who assaulted their stepdaughters, is that Nassar is a monster. "They don't want to see themselves in those men," says Cheryl. "The men in group sense that these famous men are entitled."

While Matt sat on Jennifer and Cheryl's worn-down couch, forced to take responsibility for his offense, Harvey Weinstein–who is under investigation for rape in New York–was in Arizona at a spa-like treatment facility that charges $58,000 for a 45-day stay and is known for treating "sex addiction," a controversial diagnosis not found in the Diagnostic and Statistical Manual of Mental Disorders. Sex-addiction treatment is designed to help people with impulse-control issues and, like Alcoholics Anonymous, focuses on abstinence and avoiding triggers.

Experts emphasize that men who commit crimes like rape, assault and indecent exposure should receive sex-offender therapy, not sex-addiction therapy. Sexual behavior that is coercive or violent is a crime and very different from someone who compulsively cheats with a willing partner or misses work because he can't stop watching porn. Psychologists who work with sex offenders say many men try to use the "sex addiction" label as a way to abdicate responsibility for actions that are illegal and abusive. The only way for

them to get better and to lessen their risk to society, therapists say, is to confront what they have done, not excuse it.

**People have been sharing their problems** with Cheryl all her life, even before she was a therapist. During a session, she lets every emotion show, frowning in sympathy and rolling her eyes when patients try to fool her. She began her career working with children who had been abused. When first offered a chance to work with sex offenders, she refused. But she decided to go to a session out of curiosity. "I was like, 'Oh, God, I'm walking into this group of disgusting, dirty, icky men," Cheryl says. But when she arrived, the men looked like her neighbors and friends, and some genuinely wanted to change. She decided to take on the challenge, and later she and Jennifer started up a practice.

They both still work with survivors and know that the damage these men have wrought on their victims cannot be undone. But they have come to believe counseling can curtail most offenders' impulses and allow them to function safely in society. "I hear the awfulest stories and even have to excuse myself to throw up," Cheryl says. "Sometimes these guys come in here complaining about having to drive a little further to get groceries because they're on the registry, and I'm like, 'To hell with you. Think of how your victim feels.'"

Many patients don't want to contend with what they've done to their victims–at least initially. Some therapists ask their patients to attend local sentencing hearings and listen to other victims' testimonies. Others instruct their patients to role-play as their victims. Cheryl opts for a more personal approach.

When Rob was 20 years old, he partied a lot. He would stay out late, ignoring his mom's texts and "drive home drunk, literally every night." He met a 15-year-old girl at a party and had sex with her. Her parents pressed charges, and Rob didn't tell his own mother until he had a court date set. He spent one year in prison for statutory rape and another two for parole violations. When he first met Cheryl, he told her, "Lady, I'll sit here, but I don't need therapy, and I don't care about this." Eventually, he became one of the most active members in the group.

He does electrical work now, thanks, he says, to the therapy he once dismissed. He got the job through a man who went through Cheryl's program before him. Rob recently proposed to his fiancée and has since brought her to a few individual therapy sessions. She is older than him and has two daughters; he can't attend their school plays or graduation.

Cheryl asks Rob how treatment has helped him to take responsibility for what he did. He speaks in vague terms about how he "f-cked up." Cheryl stops him. "Define what 'f-cked up' means. Be specific."

"I had a good job. I was working," he says. "Instead of listening to my family and the people who cared about me, I just rebelled."

"And then what happened?"

"I committed my offense." He can't bring himself to say what that offense was.

"What were the consequences of that?"

"I lost everything."

"That's still about you, honey," Cheryl says. "What happened to your victim?"

"Her life was affected–I don't know how. I haven't had contact with her."

Cheryl changes tack. "You've almost got two stepdaughters about [your victim's age]. What do you think the impact would be on them, meeting someone like you when you were 20?"

"I mean, they'd be traumatized. They'd be–" he's quiet for a minute. "I can't think of the right word. I'm stuck." He looks down into his lap.

"You're getting ready to become a parent," Cheryl says. "So I'm really challenging you. What kind of person were you then, the person you wouldn't want your stepdaughters to meet now?"

"I didn't care about anything. I was drinking, using drugs. I just wanted to get my rocks off. It didn't matter with who or at what age. We try to talk to them, the kids, about that because, well, they're like my kids."

"I've seen you grow up," says Cheryl. "You came to us with an eff you, eff me, eff whatever attitude. Now you've got these two girls and you get to tell them, 'I was the 20-year-old boy who couldn't wait to get with some sweet little 15-year-old.' And you can tell them you didn't give a rip about that girl as long as she was gonna like you. I mean, you didn't force her, you didn't trick her.'"

"Well, I didn't trick her, and I did."

Cheryl smiles. "Thank you for correcting me."

"I tricked her because I had the nice car. I used what I had to my advantage when I wanted. Did I trick her into a dark alley? No. Was it mutual? Yes. But I had nice things. I was able to buy the drugs and alcohol. So yes, I did trick her. And I don't want them to get tricked–even if it's mutual. They're too young to know."

Later, she asks Rob if he would want to talk with his victim in person if he could.

"Honestly, no," he said. "I've got a good thing going right now, and I feel like if I heard that I just f-cked her life up, it would send me in this spiral."

"But that is what empathy is," Cheryl says. "Sitting across from your victim and listening to her and understanding how she feels." She tells him a story of a client whose neighbor found him on the sex-offender registry and confronted him in a grocery store. "You hurt a child," she yelled at him in the cereal aisle. This patient, Cheryl says, had a moment of self-realization. He dropped to his knees on the linoleum floor and said, "I used to be that man that did those awful things to the little girl and the amount of regret I have is sometimes unfathomable."

That, she argues, is truly taking responsibility for your actions.

"I would meet with her if she wanted to," Rob says. "I would just be scared. I just–it would be hard."

**Cheryl has observed** these sorts of conversations between assailant and survivor before at the request of both parties and believes they have the potential to be healing. Some victim advocates are skeptical. "Every time I saw my rapist, I threw up," says Anderson, who became a lawyer to defend victims of assault after a professor raped her in graduate school. "One of my clients was forced to talk to her attacker, and she became suicidal."

Sex-offender therapists and victim advocates are often on opposite sides on questions of crime, punishment and rehabilitation, though both ultimately hope to reduce sexual violence. The data on treatment is limited, but what there is points toward the value of therapy. While there are no recent, official statistics on national sex-offender recidivism, an overview of studies looking at the numbers in Connecticut, Alaska, Delaware, Iowa and South Carolina found that the rate is about 3.5% for sex offenders. That figure takes into account all crimes, including parole violations, not just sex crimes.

In 2010, research published in the American Journal of Public Health suggested that strict laws about registration, surveillance and residency can create a feeling of hopelessness and isolation that can actually facilitate re-offense. Several studies show that rehabilitative therapy, when paired with legal measures, can give offenders a sense of hope and progress and reduce recidivism rates by as much as 22%.

To many survivors and advocates, the experience of sexual assault is so horrifying that any recidivism risk is too high. "The emotional toll on the victim when it does happen is immeasurable," Anderson says. "Those nightmares last a lifetime." There are also far more victims than perpetrators, which increases the potential consequences of any re-offense. There are fewer than 1 million men on the sex-offender registries; sexual-assault victims

number in the millions, according to the Rape, Abuse & Incest National Network, a survivor advocacy group.

Kevin, 68, one of the men in Cheryl and Jennifer's therapy group, traumatized hundreds of women. For 45 years, he was a compulsive exhibitionist. He would visit movie theaters, sit next to a woman and masturbate once the lights dimmed. He fantasized that the women were aroused by his behavior, though he now says, "They never actually were." He did this nearly every day, sometimes multiple times a day.

Kevin spent time in jail and psychiatric treatment centers but never went to prison. He managed to hold down a job as a clerk at a home-improvement store. Eventually, he stopped exposing himself, but not because of therapy. "I got older, my sex drive got lower. I got on a drug that basically is designed, if you take in high doses, to reduce your testosterone level and reduce your sex drive," he says. "I'm not sure that just therapy would have been able to break the cycle."

But Kevin says the sessions have helped him understand the motivation for his behavior. He now believes that he exposed himself in the hopes of making a human connection, however irrational that may sound. "When I would do it, it was like I was in a trance. I'm just absorbed in what I'm doing, trying to get a positive response, which I very seldom got," he says. "It took me a long time to figure out that women don't want to see that. They find it disgusting."

**Whether you believe that therapy** can redeem someone like Kevin may depend on whether you believe people can learn empathy. Researchers at the University of Cambridge published a study in March that suggests subjects' ability to empathize with others had little to do with their genetic makeup and more to do with how they were raised. Empathetic people are made, not born.

Many of the men Cheryl and Jennifer counsel experienced emotional, physical or sexual abuse themselves when they were young. As the therapists often say in group, "Hurt people hurt people." At sentencing hearings, Cheryl testified to

the likelihood that a sex offender can reform based on their history. But there are no guarantees.

In October, the Supreme Court will consider a complicated case challenging the federal laws that govern some sex offenders. The decision could allow hundreds of thousands of convicted offenders to move more easily across state lines and eventually remove their names from the sex-offender registry.

Even if that suit fails, civil rights proponents and victim advocates will likely confront each other again in the nation's highest court. A Colorado federal judge recently ruled that the state's sex-offender registry is unconstitutional. He said the list constitutes cruel and unusual punishment because it can subject these men to ostracism and violence at the hands of the public and that it fails to properly distinguish between different types of offenses.

The Colorado judge's decision ignited outrage. In response, attorneys general from six states wrote a joint amicus brief to overturn the ruling on appeal. In their brief, the attorneys general quote a judge from a separate case regarding sex offenders in Wisconsin: "Parents of young children should ask themselves whether they should worry that there are people in their community who have 'only' a 16% or an 8% probability of molesting young children."

In an attempt to resolve the tension between public safety and individual redemption, the law has settled on an imperfect compromise: sex offenders are inscribed on a registry, sometimes permanently. But they are also ordered to attend therapy to get better. The bad men are left in limbo.

Inside the small taupe house, Cheryl and Jennifer work to move through that limbo, one conversation at a time. As the bright winter sun sets and the office grows cold, a group therapy session comes to a close 45 minutes after it was supposed to. The men rise from the worn couch and pull on their coats and hats. One has to head home to meet his parole-mandated curfew. The man with the ankle bracelet needs to charge his battery. They file out slowly, loose floorboards creaking under their feet. Tomorrow, Cheryl and Jennifer might text some of these men to see how they're doing. They might call their wives or

bosses or parole officers. They'll review the homework the men have turned in and prep for individual therapy sessions.

After those meetings end and the men leave the house for good, Cheryl and Jennifer may never know what becomes of them. Mostly, they hope they won't read about them in the news.

*This appears in the May 21, 2018 issue of TIME.*

**WRITE TO ELIANA DOCKTERMAN AT** ELIANA.DOCKTERMAN@TIME.COM.

COMMENTARY

# Evaluating and Reducing Risk in Online Child Pornography Cases

Fred S. Berlin, MD, PhD

In their article on the subject of risk assessment of online child sexual exploitation offenders, Hirschtritt and colleagues highlight an important finding derived from an analysis of group data which concludes that the vast majority of individuals convicted for accessing child pornography online (and who have had no prior conviction for a contact sexual offense) are at low risk of becoming a contact, hands-on, sexual offender. This commentary is intended to complement their observations by emphasizing the importance of performing a comprehensive psychiatric-forensic evaluation when assessing risk. It argues that greater emphasis should be placed upon reducing any risk that may be identified rather than simply asserting its presence. While not arguing against legal sanctions, this commentary questions their severity in some instances based upon the above noted finding. This commentary suggests that effectively addressing the mental health needs of child pornography accessors and exploring methods of primary prevention should be considered aspects of risk reduction.

J Am Acad Psychiatry Law 47(2) online, 2019. DOI:10.29158/JAAPL.003832-19

In an article in this issue of The Journal, entitled "Risk Assessment of Online Child Sexual Exploitation Offenders," the authors address a matter that has important clinical, public safety, and civil liberties implications.[1] In doing so, they define several characteristics that distinguish between "contact (hands-on) sexual offenders" against children, and "online non-contact (hands-off) offenders." Despite making such a distinction, they nevertheless still categorize both groups as sexual exploiters.

The authors used the term "online (non-contact) offender" when referring to individuals who accessed (in their words, had "engaged in") child pornography or "other child sexual exploitation materials" (Ref. 1, p 000) via the Internet. The precise nature of "other child sexual exploitation materials" was not clearly defined. The online offender group had had no known convictions for a prior hands-on sexual offense at the time of their child pornography related convictions. That online offender group did not include individuals who had attempted to solicit a child (or to solicit a government agent purporting to be a child, or purporting to have access to child) via the Internet. Some hands-on contact offenders had also been convicted for accessing child pornography and were therefore classified as "mixed" (i.e., both contact and non-contact) offenders.

The authors had no direct contact with any of the reported-upon individuals; they reviewed studies and data that contained information about them. After reviewing that data, the authors concluded that most individuals who are charged with online offenses related to accessing child pornography (and who have not had a prior conviction for a contact offense against a child) are unlikely to engage in subsequent contact sexual offenses. That finding is important given the severity of the criminal sanctions often imposed for accessing, and sometimes sharing, child pornography via the Internet.

## Criminal Sanctions for Online Access

In many jurisdictions, criminal sanctions for accessing and sharing child pornography online do not appear to be predicated upon recognition of the above noted finding. To the extent that this finding is accurate, it suggests that many accessors of child pornography do not pose a direct threat to children. Historically, one additional justification for severe sanctions had been the claim that accessors fuel the profit market for the production of child pornogra-

Published online April 15, 2019.

Dr. Berlin is Associate Professor, Department of Psychiatry and Behavioral Sciences, The Johns Hopkins University School of Medicine; Director, National Institute for the Study, Prevention and Treatment of Sexual Trauma; Director, The Johns Hopkins Sex and Gender Clinic, Baltimore, MD. Address correspondence to: Fred S. Berlin, MD, PhD, 104 E. Biddle Street, Baltimore, MD 21202. E-mail: fredsberlinmd@comcast.net.

Disclosures of financial or other potential conflicts of interest: None.

Copyright 2019 by American Academy of Psychiatry and the Law.

phy, thereby posing an indirect threat to children. At present, however, most such images can be obtained with no direct cost to the consumer, and most such images are already in existence on the Internet.

An accessor of child pornography will often initially learn that he is under investigation when a search warrant of his residence is served at or before dawn by several armed government agents. At that time, his computer and other electronics will ordinarily be confiscated and forensically analyzed for content. Child pornography is often accessed online via a file-sharing network.[2] As a consequence, many accessors are also charged with "distribution" because their computers will have allowed sharing (uploading of such images) to other computers in that network. In the federal system, where a child is defined as anyone under the age of 18 years, sentences for accessing child pornography online (which falls under federal jurisdiction) frequently result in a period of incarceration of at least two to four years.[3] Sentences may be less severe in some state courts.

Following successful prosecution, most accessors will become convicted felons and will often serve time in prison away from their families. They will lose their voting rights and will be placed on a sex offender registry, frequently for years. This outcome can further restrict where they are permitted to reside and their ability to attend school activities with their own children.[4,5] Arguably, the finding that significant numbers of individuals who access child pornography online do not pose a direct, or perhaps even an indirect, threat to children calls into question the justification for such severe consequences.

## Significance of Self-Disclosed Offenses

Criminal justice research invariably involves some level of uncertainty regarding the possibility of undetected illegal acts. Hirschtritt *et al.*[1] addressed the question of whether some individuals who had been convicted of accessing child pornography may have also engaged in sexual acts with children that had previously been undetected, but which subsequently might have been self-disclosed. If such previously undetected acts had occurred, what relevance, if any, might such a finding have with respect to assessing future risk?

The authors referenced a 2009 retrospective study conducted at a Federal Bureau of Prisons facility in Butner, North Carolina, which suggested that more than 80 percent of men convicted for possessing

child pornography had engaged in previously undetected hands-on sexual activities involving children, based on their own self-disclosures while in treatment.[6] Critics have pointed out that the Butner study relied heavily upon polygraph examinations, often considered unreliable by the scientific community.[7,8] Critics have also pointed out that the child pornography offenders in the Butner study, all of whom were incarcerated and receiving treatment, may have felt pressured into falsely admitting to prior sexual contacts with a child to avoid accusations of being in denial. There is considerable published literature regarding the existence of false confessions made under pressure.[9] In point of fact, some of the self-disclosures made in the Butner study were subsequently proven to be false.[8]

Canadian researchers reviewed several studies looking at the issue of self-disclosed prior sexual contact with children by individuals convicted for accessing and possessing child pornography.[10] The Canadian meta-analysis reported a wide range of such self-disclosures. Often the exact nature of such self-disclosed contacts was unclear. For example, did such contacts involve penetrative sex, or touching a child's leg while secretly feeling aroused? Frequently, the ages of such unidentified children had not been reported, nor was it clear that all of the self-disclosing adults had themselves been of legal age at the times of the incidents in question. It would appear that few, if any, of those self-disclosures resulted in reports being made to criminal justice authorities who could have then investigated their veracity.

At present, it is unclear precisely what percentage of persons convicted for accessing child pornography online have had some sort of a prior undisclosed sexual contact with a child. That said, with respect to assessing risk, there is no documented evidence that such self-disclosures, whether accurate or not, can reliably predict the probability of future similar acts. Such predictions would likely be even more unreliable when appropriate treatment, support, and supervision is implemented. Clinical experience suggests that significant numbers of men who have acknowledged prior sexual contact with a child have not subsequently engaged in similar acts.

## Accessors' Subsequent Contact Offenses

The conclusion cited by Hirschtritt *et al.*,[1] i.e., that most individuals who access child pornography (and who have not been convicted of a prior contact

sexual offense) are unlikely to engage in subsequent contact offenses, was based upon a thorough literature review and analysis. At least three relatively large prospective studies supported those findings.[10,11,12] One study was performed in Switzerland, a second in Canada, and a third in the United States by the U.S. Sentencing Commission.

The Canadian study, which involved a cohort of 2,630 men convicted for possessing child pornography, documented that only two percent had gone on to commit a hands-on sexual offense over a six-year follow-up period.[10] The Swiss study, involving a cohort of 231 men, found that fewer than one percent (2/231) of individuals who had been convicted for accessing child pornography (and who had no prior convictions for any sort of child sexual abuse) had gone on to commit a subsequent hands-on sexual offense over a six-year follow-up period.[11] The U.S. Sentencing Commission study, which included 610 men convicted for possessing child pornography, documented that only 3.6 percent had been accused of a subsequent hands-on sexual offense over an 8.5-year follow-up period.[12] More than 96 percent received no such subsequent allegations, let alone convictions. Although one could speculate that significant numbers of undetected crimes were still being committed, many of those individuals were being closely monitored and in treatment, making that less likely. These studies strongly suggest that, as a group, individuals convicted for accessing child pornography online (who have had no prior contact convictions) are at low risk of engaging in contact sexual offenses against children in the future.

## Data Pertaining to a Given Individual

In attempting to assess risk, studies of the sort noted above analyze data gathered from groups of individuals who have been convicted for accessing child pornography. It is also possible to analyze data gathered from a specific individual who has been convicted for doing so. This can include an analysis of evidence obtained from that person's confiscated computers, cell phones, and other electronic devices. Such an analysis by an evaluating forensic psychiatrist can assist in better appreciating underlying motivations and interests.[13] For example, do the confiscated electronic devices in a given instance show evidence of any attempts to engage in sexualized chats with children? Is there evidence that any of the child pornography accessed has ever been used to try

to groom a child sexually? Has the individual in question been accessing Internet sites that cater specifically to children? If the criminal case has generated publicity, have any children come forward alleging sexual misconduct? Have any children known to that individual made such an allegation? If the answer to each of the above noted questions is "no," this increases the probability that, despite a possible interest in voyeuristically viewing child pornography, the individual being evaluated is likely not motivated to seek out a child for sexual purposes. One can also look at the percentage of child pornography relative to the percentage of adult pornography on an individual's confiscated electronics to get some sense of that person's predominant interests. Though knowledge about group data of the sort reviewed above can be of importance in assessing risk, these factors specific to a given individual should also be considered.

## Child Pornography as Fantasy Activity

From a psychiatric and psychological perspective, it is important to appreciate that accessing child pornography online is ordinarily a private fantasy-related activity. As such, it may not necessarily be reflective of real-life desires that involve others. For example, a percentage of women in therapy have reported experiencing sexually arousing fantasies about being raped.[14] They may even have enjoyed reading romantic novels in which women are being mistreated sexually. This does not mean that those women actually want to be raped. Many individuals spend hours on their computers playing war games in which they pretend to kill others. That does not necessarily mean that they have a real-life interest in actually doing so. From a psychological and psychiatric perspective, an interest in viewing child pornography is not necessarily synonymous with an interest in engaging in contact sexual offenses with children.

## Who Is Accessing Child Pornography?

In assessing the risk of a given individual, knowledge about statistical analysis of group data must be accompanied by a comprehensive psychiatric evaluation. That evaluation should include a review of relevant discovery materials, an in-depth clinical interview, a case-specific formulation, diagnostic considerations (including comorbidities), and treatment recommendations. Actuarial analysis of group data designed to assess risk provides little information

**Commentary**

about the strengths, support system, and psychiatric vulnerabilities of a given evaluee, yet such information may be crucial when considering risk. It can also be of importance when considering treatment recommendations and criminal justice options.

In considering risk and interventions that can assist in lowering risk, it is important to keep in mind that the well-being of actual people is at stake. That is true both with respect to concerns about the possibility of future victimization, as well as with respect to concerns about the lives of accessors of child pornography and their families.

Table 1 presents a brief synopsis of five individuals convicted for accessing child pornography.[15] These five examples are not necessarily meant to be representative of the larger population. They are examples taken from forensic cases that included a psychiatric evaluation. The intention in presenting them is to illustrate the point that actuarial group data designed to assist in assessing risk often reveals little about the humanity, psychological makeup, or potential mental health needs of a given individual. Yet those factors can be important in assessing risk.

## Distinguishing Types of Risk

Accessing child pornography is a behavior, and individuals can engage in similar behaviors for a variety of reasons. Understanding these reasons can be relevant in appreciating risk, as well as in guiding treatment and other interventions designed to manage any risks that may be present. From a clinical and forensic perspective, an important goal should center on reducing any risk that may exist, rather than simply trying to predict it in a vacuum.

The individual who has accessed child pornography relatively few times out of curiosity may be quite different from the person with a paraphilic disorder involving components of both pedophilia and voyeurism (other specified paraphilic disorder) who experiences recurrent sexual fantasies and urges about viewing it. Making a correct differential diagnosis that distinguishes between mere curiosity, a voyeuristic desire to view child pornography, and a real-life interest in being sexual with children can be important in determining what sorts of risks, if any, may be present.[16] The finding that most accessors of child pornography (who have not been convicted of a contact sexual offense) do not subsequently become hands-on sexual offenders supports the conclusion that there is a subgroup of accessors for whom accessing and viewing it is an end in and of itself.

Arguably, anyone can access and view child pornography. Most persons, however, experience little or no desire to do so, let alone having to repeatedly resist recurrent urges and fantasies about doing so. Why some individuals experience urges to view child pornography, whereas most persons do not, remains a matter for future research.

## Diagnosis, Treatment, and Reducing Risk

For the most part, legal statutes pertaining to accessing child pornography do little, if anything, to address related mental health conditions such as autism, dementia, pedophilia, or some other type of paraphilic disorder. Urges to view child pornography cannot be punished away, any more so than an urge for heroin or alcohol can be punished away. Under such circumstances, treatment may be a critical com-

Table 1    Five Examples of Convicted Child Pornography Accessors

| | |
|---|---|
| Retired Senior | 78-year-old retired man developed an interest in collecting erotica, some of which was categorized as child pornography. Not believing he had acted wrongfully, he took the computer containing those images for repair, and the computer technician notified legal authorities. |
| Gay Adolescent | 18-year-old male periodically viewed pornographic images of 15-, 16-, and 17-year-old males online. He was prosecuted for receiving and possessing child pornography. |
| Traumatic Brain Injury | Young male in early 20s had sustained a traumatic brain injury a few years prior to arrest. Having become mildly disinhibited, he began spending hours in his mom's basement viewing pornography, some of which had been child pornography. |
| Autism | Young male in mid-20's on the autism spectrum had difficulty relating socially and sexually to peers. Still a virgin, his way of having sex was via masturbation while viewing pornography online, which included, at times, child pornography. |
| Sexting | 18-year-old male received naked pictures of herself from his 16-year-old girlfriend. Her parents notified legal authorities, and he was charged with receiving and possessing child pornography. |

ponent in reducing whatever risk may exist. Ordinarily the ability of treatment to reduce any such risk requires an understanding of the condition needing treatment, as well as an appreciation of evidence regarding treatment efficacy.

Hirschtritt and colleagues[1] address a number of treatment-related topics. In doing so, they note that behavioral approaches may include the use of aversion therapy. There is little evidence, however, that aversion therapy can change long-term sexual behaviors, as evidenced by the historically misguided effort to "decondition" homosexual desires.[17] The authors also discuss the use of cognitive behavioral therapy to assist accessors in "appreciating the impact of online offending on its victims" (Ref. 1, p 000). One could debate the extent to which a given victim is actually harmed by an individual privately viewing child pornography, perhaps limiting the efficacy of such a cognitive approach. Victims are sometimes notified when a child pornography accessor has been convicted so that they can receive restitution from that individual.[18] Whether the act of privately viewing such images (as wrong as it may be) causes that victim additional suffering, or whether notifying them about what had occurred simply keeps an old wound open, deserves further study. For an accessor to contend that his actions have not directly harmed a specific victim is not necessarily distorted thinking.

Hirschtritt and colleagues[1] suggest that pharmacological therapy (including androgen-deprivation therapy) for online accessors of child pornography should be "reserved for treatment-refractory cases" (Ref. 1, p 000) or based on patient preferences. Persons who experience urges to access and view child pornography should be educated, through an informed consent process, about the spectrum of available treatment options, including their potential benefits, risks, and alternatives. This is a standard of care that can be especially important in cases in which treatment failure can cause risks, including the risk of legal jeopardy for a patient. In the federal system, a second child pornography conviction can carry a minimum mandatory 10-year sentence. Pharmacological treatments should not necessarily be reserved for treatment-refractory cases.[19,20]

## Prevention as a Means of Risk Reduction

Hirschtritt and colleagues[1] refer to the Dunkelfeld project in Germany.[21] That project reaches out to persons in the community who may be coping with unacceptable or unwanted sexual urges. In the United States, one frequently hears public service announcements encouraging individuals who are depressed, addicted to alcohol or drugs, or who manifest a variety of other mental health needs to come in for treatment. With the possible exception of efforts by the Safer Society Foundation (www.safersociety.org), how often does one hear a public service announcement in this country encouraging individuals who may be struggling to maintain sexual self-control (including those who may be struggling to resist the urge to view child pornography) to come in for help? In Maryland, where this author practices, individuals wanting help for the urge to view child pornography have come forward seeking mental health assistance. Were an individual to seek such assistance in California, mental health professionals would be required to make a mandatory report to criminal justice authorities.[22] It is unclear what evidence suggests that such an approach can help to reduce future risk.

Stigmatizing those who access child pornography, rather than attempting to better understand why anyone would experience such desires in the first place, and denying them easy access to treatment is likely not the best way to reduce risk. Forensic psychiatry is in a unique position to provide leadership, not only with respect to ascertaining risk but, perhaps more importantly, with respect to defining mental health needs and available interventions that can effectively reduce any risks that may be present. Doing so can be in the best interest of both accessors and potential accessors of child pornography, as well as in the best interest of the community.

## References

1. Hirschtritt ME, Tucker D, Binder RL: Risk assessment of online child sexual exploitation offenders. J Am Acad Psychiatry Law 47; 000–000, 2019
2. Peer-to-peer networks provide ready access to child pornography. Washington, DC: Government Accountability Office, 2003
3. Doyle C: Federal mandatory minimum sentencing guidelines. Washington, DC: Congressional Research Service, 2013
4. Stop It Now: What is the legal distance a registered sex offender can live near a school or a park? Available at: www.stopitnow.org/advise-column_entry/what-is-the-legal-distance-a-registered-Sex-Offender-can-live-near-a-school-or-a. Accessed February 12, 2019
5. Levenson JS, Tewksbury R: Collateral damage: family members of registered sex offenders. Am J Crim Justice 34:54–68, 2009
6. Bourke M, Hernandez A: 'The Butner Study' redux: a report of the incidence of hands-on child victimization by child pornography offenders. J Fam Violence 24:183–91, 2009

Commentary

7. The Butner Study: a report on the fraudulent execution of the Adam Walsh Act by the Federal Bureau of Prison (BOP), 2011. Available at: https://rsoresearch.files.wordpress.com/2012/01/butner_study_debunking_kit.pdf. Accessed February 12, 2019

8. Wollert R, Skelton A: Egregious flaws discredit the Butner Redux study, in: Caught in the Web of the Criminal Justice System: Autism, Developmental Disabilities, and Sex Offenses. Edited by Dubin L, Horowitz E. London: Jessica Kingsley Publishers, 2017, pp 185–214

9. Henkel LA, Coffman KJ: Memory distortions in coerced false confessions: a source monitoring framework analysis. Appl Cognitive Psychol 18:567–88, 2004

10. Seto MC, Hanson RK, Babchishin KM: Contact sexual offending by men with online sexual offenses. Sex Abuse 23:124–45, 2011

11. Endrass J, Ubaniok F, Hammermeister LC, et al: The consumption of internet child pornography and violent and sex offending. BMC Psychiatry 9:43, 2009

12. Recidivism by child pornography offenders. Washington, DC: U.S. Sentencing Commission, 2012, pp 293–306

13. DeHart D, Dwyer G, Seto MC, et al: Internet Sexual Solicitation of children: a proposed typology of offenders based on their chats, emails, and social network posts. J Sex Aggress 23:77–89, 2017

14. Bivona J, Critelli J: The nature of women's rape fantasies: an analysis of prevalence, frequency, and contents. J Sex Res 46:33–45, 2009

15. Berlin FS: Accessors and distributors of child pornography: not who you think they are, in: Caught in the Web of the Criminal Justice System: Autism, Developmental Disabilities, and Sex Offenses. Edited by Dubin LA, Horowitz E. London: Jessica Kingsley Publishers, 2017, pp 215–27

16. Berlin FS: Pedophilia: criminal mind-set or mental disorder? A conceptual review. Am J Forensic Psychiatry 32:3–25, 2001

17. Ford JG: Healing homosexuals: a psychologist's journey through the ex-gay movement and the pseudo-science of reparative therapy. J Gay Lesbian Psychother 5:69–86, 2001

18. Amy and Vicky Child Pornography Restitution Improvement Act, 18 U.S.C. § 2259 (2014)

19. Berlin FS: Commentary: risk/benefit ratio of androgen deprivation treatment for sex offenders. J Am Acad Psychiatry Law 37:59–82, 2009

20. Berlin FS: Paraphilic disorders: a better understanding. Curr Psychiatry, in press

21. Beier M, Neutze J, Mundt I, et al: Encouraging self-identified pedophiles and hebephiles to seek professional help: first results of the Prevention Project Dunkelfeld (PPD). Child Abuse Negl 33:545–49, 2009

22. Friedersdorf C: Should therapists have to report patients who viewed child pornography? The Atlantic. July 28, 2015. Available at: https://www.theatlantic.com/politics/archive/2015/07/should-therapists-have-to-report-patients-who-viewed-child-pornography/399524. Accessed February 12, 2019

Current Psychiatry Reports (2021) 23: 51
https://doi.org/10.1007/s11920-021-01259-3

SEXUAL DISORDERS (LE MARSHALL, SECTION EDITOR)



# Does Treatment for Sexual Offending Work?

Nichola Tyler[1] · Theresa A. Gannon[2] · Mark E. Olver[3]

Accepted: 27 May 2021 / Published online: 1 July 2021
© The Author(s) 2021

## Abstract

**Purpose of Review** We review and synthesize the literature on the effectiveness of offense-focused treatment for sexual offending. Specifically, we consider whether the extant literature suggests treatment is effective in reducing sexual reoffending and features of effective interventions. We also consider how the design of program evaluations may influence treatment outcomes.

**Recent Findings** Recent research suggests that offense-focused psychological treatment for sexual offending shows some level of effectiveness in reducing both sexual and general reoffending. Further, there appear to be key program, individual, and study design features associated with treatment effectiveness.

**Summary** Although recent findings paint an optimistic outlook for offense-focused psychological treatment for sexual offending, further high-quality differential studies are needed to fully understand the range of content, delivery, and individual factors associated with successful treatment outcomes so as to establish what works best for whom.

**Keywords** Sexual offense treatment · Sexual recidivism · Treatment effectiveness · Sexual offending · Treatment moderators

## Introduction

Offense-specific treatment for sexual offending is commonly provided in Western countries with the primary aim of reducing risk of sexual reoffending. Treatment is often psychological and is provided across various settings including the community, forensic mental health hospitals, and prison settings. Nevertheless, although treatment is a common feature of forensic practice for sexual offending, there is much variation

<hr />

This article is part of the Topical Collection on *Sexual Disorders*

✉ Nichola Tyler
  Nichola.Tyler@vuw.ac.nz

  Theresa A. Gannon
  Theresa.Gannon@kent.ac.uk

  Mark E. Olver
  Mark.Olver@usask.ca

1  School of Psychology, Victoria University of Wellington, PO Box 600, Wellington 6140, New Zealand

2  Centre of Research and Education in Forensic Psychology (CORE-FP), School of Psychology, University of Kent, Canterbury CT2 7NZ, UK

3  Department of Psychology, University of Saskatchewan, Saskatoon, Saskatchewan S7N 5A5, Canada

across programs in terms of content, structure, and delivery [1]. Given the widespread use of treatment for sexual offending, it is imperative to understand whether such interventions result in meaningful reductions in sexual reoffending, not only for public protection but also to ensure interventions are beneficial for those who volunteer or are mandated to attend them.

The British Ministry of Justice evaluation of the "Core" psychological sexual offender treatment program (SOTP) recently highlighted the importance of understanding "what works" in treating sexual offending [2••]. In this study—which is the largest single study evaluation to date—the reoffending rates for men who completed the "Core" SOTP (*n* = 13,219) in England and Wales (between 2000 and 2012) were compared to those of a propensity score-matched untreated comparison group (*n* = 2562). Over an average 8.2-year follow-up, nonsexual reoffending rates appeared largely similar across the groups. However, sexual reoffending for the treated sample was found to be *higher* than that of the untreated comparison group (10% versus 8%, respectively), representing an absolute increase in sexual reoffending of 2% and a relative increase of 25%. The findings from this study understandably created concern. In short, they suggested that tens of thousands of individuals who had sexually offended and received psychological "treatment" may have been made worse by a program intended to make them better





[3]. This study also highlighted the importance of understanding the key ingredients associated with successful treatment for sexual offending.

A previous review of the literature on psychological interventions for sexual offending was reported in this journal in 2013 [4]. Since then, there have been a number of key developments in the field, including the British Ministry of Justice study and one large meta-analysis involving over 40,000 individuals examining the effectiveness of psychological treatment programs for sexual offending [5••]. The purpose of the current article is to provide a recent and updated synthesis of (1) the literature on the effectiveness of offense-specific psychological treatment for reducing sexual reoffending and (2) the factors that may influence the effectiveness of such programs (e.g., program orientation, content, staffing, and individual characteristics). Consideration will also be given to the effect of study design on evaluation outcome, an area that has attracted much attention and debate from researchers in the field both historically [6–9] and more recently [10–13]. Throughout the review, we will specifically focus on the findings from key meta-analyses and important single studies that have contributed to current understanding in the area. Given the vast majority of research and practice has focused on the treatment of adult males who have committed sexual offenses, we will focus on the effectiveness of treatment with this population.

## Effectiveness of Offense-Specific Treatment for Sexual Offending

A number of meta-analyses have been undertaken over the last 20 years that have synthesized outcome evaluations of treatments for sexual offending [5–8, 10, 12, 14–17]. Many of these studies have examined both biological and psychological treatments [8, 10] or sexual offense-specific and more generic psychological treatments [7, 16]. While not all of these meta-analyses have found positive treatment effects [6, 17], at least seven indicate reductions in sexual reoffending [5, 7, 8, 10, 12, 14, 16].

Lösel and Schmucker's 2005 meta-analysis included 69 evaluations of biological (e.g., surgical castration and hormonal medication) and psychological treatments for adults and adolescents who had sexually offended ($n = 22,181$) [8]. The treatment groups showed lower rates of sexual (11.1% vs. 17.5%), violent (6.6% vs. 11.8%), and any reoffending (22.4% vs. 32.5%) relative to comparisons. Overall, biological treatments (vs. psychological) were found to produce stronger effects as did treatments designed specifically for sexual offenses. Schmucker and Lösel updated this meta-analysis 10 years later but with an exclusive focus on high-quality studies (i.e., quasi-experimental design with between group equality or above) [12]. Twenty-seven studies ($n = 10,387$) were included in the final meta-analysis, and all of these were psychological

interventions. Although low rates of reoffending were noted for the treatment groups, these were smaller than detected in the previous meta-analysis (10.1% vs. 13.7% for sexual reoffending; 32.6% vs. 41.2% for any reoffending).

Most recently, Gannon et al.[1] conducted the largest meta-analysis to date comprising 41,476 individuals who had sexually offended and including the politically influential British Ministry of Justice "Core" SOTP evaluation [5••]. This meta-analysis examined only offense-specific psychological treatment for sexual offending as well as staff and program variables previously not explored. Although the British Ministry of Justice evaluation was identified as an outlier, when it was included in the analysis, sexual offense programs were found to produce significant reductions across all types of reoffending, most notably in sexual reoffending (9.5% vs. 14.1%) amounting to a relative reduction in sexual reoffending of 32.6%. This meta-analysis also highlighted the key staff and treatment program moderators required for optimal reoffending reductions which we describe in the sections below.

## Factors Influencing Treatment Effectiveness

Given correctional policy makers and practitioners are under increasing pressure to provide interventions that are maximally effective, from both a societal and fiscal perspective, it is crucial to understand the core features or ingredients of treatment that produce the strongest and most sustained effects. Potential moderating factors that have been examined to date can be broadly grouped into (1) program orientation and delivery method (e.g., underlying theory, principles, duration, and modality), (2) program content (e.g., exercises, treatment targets), (3) program staffing, and (4) treatment setting.

**Program Orientation and Delivery Method** Meta-analyses have shown that the underlying theory, principles, dosage, and modality of treatment are associated with differences in treatment outcomes. For example, psychological programs that adhere to the risk (i.e., match treatment intensity to risk level), need (i.e., prioritize dynamic risk factors, aka criminogenic needs, for intervention), and responsivity (i.e., individualize treatments to unique client characteristics) (or RNR) principles of effective rehabilitation [19] show larger reductions for both sexual and general reoffending compared to those that do not adhere to these principles [7]. Psychological interventions that are cognitive behavioral (e.g., CBT) in orientation have also been shown to elicit stronger positive effects [8, 12, 20]. However, it is important to note that the majority of evaluations have focused on CBT-

---

[1] One further meta-analysis has been published since by Harrison et al. [18]; however, this meta-analysis does not include any studies published after 2012.



Curr Psychiatry Rep (2021) 23: 51

based interventions; therefore, it is difficult to make comparisons with other therapeutic approaches [5, 8, 16].

While strength-based psychological approaches, such as the Good Lives Model [21], are increasingly popular in the criminal justice system, there are almost no longitudinal evaluations examining the effects of these on sexual reoffending [22]. One exception to this is a recent study by Olver, Marshall, Marshall, and Nicholaichuk which presented a retrospective comparative evaluation of two prison-based sexual offense-focused psychological interventions: Correctional Service Canada's (CSC) SOTP and an early version of the Rockwood treatment program [23•]. Both interventions evaluated were underpinned by a CBT/RNR approach; however, the Rockwood program incorporated strength-based elements, whereas the CSC SOTP program encapsulated more traditional risk reduction/management principles [23–25]. The recipients of both groups were compared to an untreated comparison group on reoffending data obtained from police records which included all charges and convictions over an 8-year average follow-up period. Statistical controls were used to manage key differences across the groups such as baseline risk. While both treatment groups displayed significantly lower rates of sexual and violent reoffending relative to the comparison group, the strength-based Rockwood program generated the lowest sexual reoffending rates (5.4% vs. CSC SOTP 12.6% vs. the comparison group 19.6%). While this is a single study, the results offer some support for the inclusion of strength-based elements in psychological treatment for sexual offending.

Researchers have come to varying conclusions about the impact of treatment length and format on treatment success. For example, Schmucker and Lösel [12] did not find any association between treatment duration (measured by the number of weeks treatment delivered) and reoffending; however, Gannon et al. reported effects according to number of hours delivered [5••]. Reductions in reoffending were observed across all treatment lengths; however, 100- 200 hour programs generated smaller effects than shorter (i.e., less than 100 hours) and longer (i.e., more than 200 hours) programs. Although these two meta-analyses have drawn different conclusions about the influence of treatment length on effectiveness, neither factored in participants' risk level which may determine the length of treatment received.

A recent review by Day et al. highlighted similar issues with the research on intensity and timing of treatment (i.e., when treatment is delivered during a person's sentence) [26•]. With respect to intensity, Day et al. concluded that there is much inconsistency in the operationalization of treatment intensity within and across jurisdictions and that there is a need for greater standardization in the calculation of dosage for sexual offense programs. Moreover, with regard to timing of treatment, although Day et al. identified clinical opinion on the optimal timing of treatment, they were unable to identify any studies that had directly examined the effect of treatment timing and

therefore concluded that it was not possible to draw firm inferences. Findings for the effect of delivery format are also variable, with Schmucker and Lösel reporting stronger effects for individual and mixed individual/group treatment formats [12] and Gannon et al. finding stronger effects for group-only treatment [5••]. It should be noted, however, that more mixed individual/group treatment format studies were available in Gannon et al.'s meta-analysis ($n = 18$) relative to Schmucker and Lösel's ($k = 4$). Moreover, while Gannon et al. included only studies of treated adult samples, Schmucker and Lösel also included adolescent treatment outcome studies which featured some individual treatment models (e.g., multisystemic therapy) with large treatment effects. Finally, Thornton (personal communication November 22, 2019) raised the possibility that psychologist presence and/or supervision may moderate the association between modality and outcome; in his examination of the Gannon et al. data, when one of these elements were available, there was little difference in magnitude of effect for group vs. mixed modality; however, when neither elements was available, there was a decidedly larger effect for group modality. Further research is needed to directly compare individual vs. group treatment or mixed individual/group vs. group treatment only on reoffending using direct comparisons (e.g., same intervention delivered in different formats).

**Program Content** Only one meta-analysis to date has directly examined the impact of program content on treatment outcomes. Gannon et al. specifically examined whether the inclusion of behavioral reconditioning procedures for inappropriate sexual arousal impacted treatment effectiveness [5••]. Programs that included some form of behavioral reconditioning ($k = 23$) were associated with superior outcomes (i.e., greater reductions in reoffending) relative to those that did not include this element ($k = 5$) or for whom this element was unknown ($k = 16$). This is a particularly interesting finding given that behavioral reconditioning procedures were not used in the "Core" SOTP evaluated by the Ministry of Justice. Gannon et al. also examined whether or not programs included polygraph testing as part of their protocol. Although only a small number of programs incorporated polygraph testing ($k = 6$), they generated weaker effects than programs that did not contain this element or for whom this element was unknown. While it is possible that use of the polygraph may impede the treatment process and effectiveness, the studies examined did not do direct comparisons of using the polygraph vs. no polygraph within a given program. Given the small $k$, we also do not know if these studies were representative of all programs that employ the polygraph and how other treatment-relevant features of these programs in terms of content and foci compare to others elsewhere.

**Program Staffing** Due to the pressures associated with providing specialist treatments on a large scale and at a low cost,





paraprofessionals have been increasingly used to deliver offense-specific psychological interventions as opposed to qualified psychologists, with the latter moving towards a "hands-off" monitoring or supervisory role in some jurisdictions [27, 28]. Gannon and Ward hypothesized that the direct involvement of qualified psychologists in the delivery of treatment should produce more positive effects due to their level of clinical competence and subject-specific expertise [27]. However, little research has examined whether the move towards the use of paraprofessionals has impacted the quality or delivery of treatment. Gannon et al. examined the effects of having direct psychological input in treatment delivery (e.g., "hands-on" facilitation) as well as the presence or absence of supervision for program staff [5••]. They found that offense-focused psychological treatment for sexual offending was most effective when a registered autonomous psychologist was consistently present in facilitating treatment (compared to inconsistently present, unknown, or never present). The presence of supervision was also associated with more positive treatment outcomes; however, the provider of this appeared to be less important, unless psychologists and non-psychologists were both involved in providing this, where treatment outcomes were weaker.

**Treatment Setting** Given that treatment for sexual offending is delivered across a range of contexts (e.g., prisons, therapeutic communities, secure mental health hospitals, and community settings), it is unsurprising that treatment setting has been considered a potential moderating factor. Unlike other moderators that have been discussed so far, research findings relating to treatment setting are more consistent. Overall, psychological interventions delivered in both inpatient and community settings have been found to be associated with reductions in sexual reoffending; however, the majority of meta-analyses suggest that community-based programs appear to produce stronger treatment effects for both sexual and general reoffending [5••, 7, 8 16]. The exception to this is Schmucker and Lösel's 2015 meta-analysis, which found only community programs significantly reduced sexual reoffending [12].

## What Works Best for Whom?

Until this point, we have focused on features of treatment that have been found to be associated with superior outcomes. However, while large-scale meta-analyses appear to suggest an overarching positive effect for sexual offense treatment that is both sexual offense-specific and psychological, it is important to note that the wider psychotherapy literature suggests that even when group effects for treatment are identified, at an individual level, the same intervention may be more (or less) beneficial for some individuals than others [29]. Given the

heterogeneity of individuals with sexual convictions, there are a range of individual factors that may act as potential moderators for treatment including age, offense type, risk level, treatment (non)completion, and level of coercion (i.e., whether treatment is mandated or voluntary). We now consider available research findings for each of these.

Several large-scale meta-analyses have found that treatment for sexual offending produces the strongest effects for clients under 18 years of age [7, 8, 12, 14, 16, 30]. Within adult samples, treatment of age homogenous groups has been found to produce stronger effects [8, 30]. While treatment for sexual offenses appears to significantly reduce sexual reoffending in both men who have offended against children and those who have offended against adults, the strongest effects have been reported for those convicted of adult offenses (e.g., rape and exhibitionism) [8, 30]. Research has not conclusively indicated any significant differences in treatment outcomes for individuals classified as high risk of reoffending compared to those classified as low risk; however, findings do suggest a stronger treatment effect for higher risk individuals [7, 12, 23]. Differences across studies for risk outcome have largely been attributed to the varying ways in which risk categories (e.g., low, medium, and high) have been operationalized [7, 12].

While there has been limited research on whether personal characteristics moderate outcomes for sexual offense treatment, there has been more of a focus on the effects of treatment (non)completion and coercion (e.g., whether treatment is voluntarily attended or mandated). Individuals who commence treatment may not complete for a variety of reasons including motivation; treatment readiness; dissatisfaction with program content, delivery, and format (e.g., working as a group); and the perceived relevance of the intervention [31, 32]. Research from the wider correctional literature suggests that non- or partial completion of treatment is associated with an elevated level of reoffending [33, 34]. This effect has been found to replicate in syntheses of sexual offending treatment, with non-completion of treatment doubling the odds of reoffending [8, 34]. With regard to coercion, findings from the wider literature on correctional treatment programs suggest that mandated treatment in custodial settings is particularly ineffective, whereas voluntary treatment produces significant effects regardless of treatment setting [35]. This effect has been mirrored in meta-analyses exclusively focusing on treatment for sexual offending [8, 12].

## The Influence of Research Design

So far our review has focused on key program and individual factors that have been identified as moderators of treatment success. However, it is also important to consider the role of research design and how this has impacted knowledge proliferation in this area.



**Outcome Measures** Reconviction data (i.e., being convicted by a court of another offense post-treatment) is often used as a long-term outcome measure for treatment success since it aligns with the primary goal of reducing offending behavior and is able to be measured systematically and objectively through routinely recorded police data [36]. However, there has been important discussion in the wider criminological and psychological literature about the accuracy of reconviction as an outcome measure both in the way in which it is recorded and whether it truly reflects actual levels of undetected offending [36, 37]. For this reason, some studies have used broader outcome measures of treatment success (e.g., arrest, reconviction, reoffense, absconding, probation violation, parole violation, parole suspension, parole revocation, and incarceration); however, these also rely on official detection and recording [36]. It is also possible that more liberal operationalizations beyond the threshold of conviction (e.g., rearrest) can represent false positives (e.g., finding of not guilty). Moreover, others have used indexes of offense severity based on the nature and number of new convictions, such as the Cormier-Lang scale, to evaluate treatment effects per a harm reduction model [38]. Few studies have incorporated data from unofficial records or self-reports (e.g., offense-related behaviors). When they do, however, research indicates that these broader outcome measures result in higher reoffending rates [39]. Meta-analyses of treatment for sexual offending have examined the effects of reoffending data quality on treatment outcome and found that studies rated as having high or very high-quality reoffending indicators (e.g., longer follow-up times) are associated with stronger reoffending reductions [5, 12].

**Research Designs** Randomized controlled trials (RCTs) are considered the "gold standard" for intervention evaluation across disciplines. However, it is recognized that it is not always possible to implement RCTs when evaluating treatment for sexual offending due to legal and ethical concerns regarding withholding treatment and/or providing suboptimal treatment to one or more groups within the trial and the potential for community harm [1, 40]. As a result, many evaluations of sexual offending interventions have adopted quasi-experimental designs, comparing outcomes for those who complete treatment to a variety of "untreated" comparison groups (e.g., incidental cohorts, retrospective cohorts, treatment non-completers, treatment decliners, individuals with lower treatment need) [10]. Although quasi-experimental designs represent good quality evaluations (tier below RCTs), international meta-analyses suggest that methodological and contextual characteristics may influence treatment outcomes. For example, sample size, quality of outcome reporting (e.g., source and quality of reoffending data), base rate of reoffending, the definition and quality of the comparison

group (e.g., the use of treatment non-completers or decliners), and the use (or non-use) of matching have been found to explain some of the variance in study outcomes [5, 8, 10, 12]. Recently, Lösel et al. examined the effect of different matching approaches (e.g., exact matching and propensity score matching) on treatment outcomes with a sample of 693 men convicted of a sexual offense residing in German prisons [11•]. While results were broadly similar using both methods, different effects were identified for certain types of reoffending. To illustrate, exact matching showed a negative trend for sexual reoffending and propensity score matching a positive effect. Lösel et al. concluded that more high-quality studies, including replications and differentiation studies (e.g., methodological and outcome comparisons), are needed to enable stronger conclusions to be drawn about the wider effect of treatment for sexual offending.

**Staffing** Finally, programs are only as effective as their implementation, and when it comes to implementation, staffing is key. Frontline staff deliver the programs, they are the eyes and ears of an institution, and they are responsible for imparting new prosocial behavioral skills and problem-solving strategies onto their correctional clientele. We see at least two issues here, the first of which is program fidelity. When programs are delivered as they are intended, this is associated with cumulatively larger effects in terms of recidivism reduction [41]. The second issue is staff relationships with clientele. The general responsivity principle can be succinctly stated as follows: "Effective rehabilitative efforts involve workers who are interpersonally warm, tolerant, and flexible, yet sensitive to conventional rules and procedures" [19] (pp. 36-37). There is a large literature demonstrating that the characteristics of staff members and their quality of relationships with correctional clientele impact program outcome. Termed "core correctional practices" (or CCPs), these refer to a constellation of staffing techniques and behaviors that include relationship practices, effective use of authority, prosocial role modeling, effective reinforcement, effective disapproval, and prosocial problem-solving. In a classic meta-analysis, Dowden and Andrews found that correctional programs broadly adhering to RNR had significantly larger effect sizes in terms of recidivism reduction when CCPs were followed ($\varphi = .25$, $k = 75$) compared to otherwise "appropriate" programs that did not demonstrate use of CCPs ($\varphi = .16$, $k = 71$) [42]. A recent meta-analysis focusing specifically on community supervision officers found officers trained in CCPs had lower rates of recidivism among their probationers than those officers without the training (36.2% vs. 49.9%, respectively, $k = 10$) [43]. In short, a program can be sound in form and content and evaluated with elegant rigorous methodology; however, this all becomes moot without well-trained staff to implement the program with fidelity and adhere to effective and humane relationship practices with their clientele.

 Springer

Curr Psychiatry Rep (2021) 23: 51

# Conclusions

Broadly, recent research suggests that psychological offense-specific treatment for sexual offending has some effect in reducing both sexual and general reoffending and outcomes can be further optimized under certain conditions, for example, adhering to RNR principles, incorporating cognitive behavioral principles, including behavioral reconditioning for inappropriate sexual arousal, having "hands on" involvement from a registered psychologist in the delivery of treatment, providing program staff with supervision, and delivering treatment in community settings. Further, individuals classified as high risk and who engage in treatment voluntarily (i.e., are not mandated to attend) are likely to make the largest gains. In contrast, the use of the polygraph within treatment and having mixed supervision with both a psychologist and non-psychological practitioner have been found to be associated with poorer outcomes. There also appear to be adverse effects of partial or non-completion of treatment consistent with the wider correctional treatment literature. Although the existing research provides us with some indicators of the requirements for treatment success, there is a lack of agreement between studies with regard to certain factors, such as delivery format (e.g., group or individual), timing of treatment, and intensity of treatment, while other treatment factors have been overlooked to date (e.g., homogeneous vs. heterogeneous group membership, therapist qualifications, and therapist to client ratios) [26•]. Future research would benefit from further exploring key ingredients for successful treatment as well as the role of individual treatment factors, so as to ascertain "what works best for whom?" In particular, more high-quality differential studies are needed to enable stronger conclusions to be made about the wider effects of treatment, to settle debate around the impact of particular treatment characteristics where current findings are conflicting or inconclusive, as well as to further knowledge development about "what works best for whom?".

## Compliance with Ethical Standards

**Conflict of Interest**   The authors declare that they have no conflict of interest.

**Human and Animal Rights**   This article does not contain any studies with human or animal subjects performed by any of the authors.

**Open Access**   This article is licensed under a Creative Commons Attribution 4.0 International License, which permits use, sharing, adaptation, distribution and reproduction in any medium or format, as long as you give appropriate credit to the original author(s) and the source, provide a link to the Creative Commons licence, and indicate if changes were made. The images or other third party material in this article are included in the article's Creative Commons licence, unless indicated otherwise in a credit line to the material. If material is not included in the article's Creative Commons licence and your intended use is not permitted by statutory regulation or exceeds the permitted use, you will need to obtain permission directly from the copyright holder. To view a copy of this licence, visit http://creativecommons.org/licenses/by/4.0/.

# References

Papers of particular interest, published recently, have been highlighted as:
• Of importance
•• Of major importance

1.  Marshall LE. The utility of treatment for sexual offenders. In: Proulx J, Cortoni F, Craig LA, Letourneau EJ, editors. The Wiley handbook of what works with sexual offenders: contemporary perspectives in theory, assessment, treatment and prevention: John Wiley & Sons Ltd; 2020. Chapter 10. https://doi.org/10.1002/9781119439325.ch10.

2.•• Mews A, Di Bella L, & Purver M. Impact evaluation of the prison-based core sex offender treatment programme. Ministry Justice Anal Series. 2017. Available from: https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/623876/sotp-report-web-.pdf. **Largest single study evaluation of specialist psychological treatment for sexual offending. Findings suggested negative effect of treatment on reoffending and led to international concern regarding the effectiveness of sexual offending treatment. Illustrates the importance of understanding "what works" in treating sexual offending.**

3.  Brown P, Ross C. Academic oversight in policy research: questions arising from the sex offender treatment programme study. Lancet Psychiatry. 2019;3:224–6. https://doi.org/10.1016/S2215-0336(19)30374-8.

4.  Hanson RK, Yates PM. Psychological treatment of sex offenders. Curr Psychiatry Rep. 2013;15:348. https://doi.org/10.1007/s11920-012-0348-x.

5.•• Gannon TA, Olver ME, Mallion JS, James M. Does specialized psychological treatment for offending reduce recidivism? A meta-analysis examining staff and program variables as predictors of treatment effectiveness. Clin Psychol Rev. 2019. https://doi.org/10.1016/j.cpr.2019.101752 **The most recent and largest meta-analysis of sexual offense treatment to date and examined the importance of staff and treatment program moderators in contributing to program effectiveness. Highlights the importance of these factors in producing superior treatment outcomes.**

6.  Dennis JA, Khan O, Ferriter M, Huband N, Powney MJ, Duggan C. Psychological interventions for adults who have sexually offended or are at risk of offending. Cochrane Database Syst Rev. 2012;12. https://doi.org/10.1002/14651858.CD007507.pub2/full.

7.  Hanson RK, Bourgon G, Helmus L, Hodgson S. The principles of effective correctional treatment also apply to sexual offenders. Crim Justice Behav. 2009;36:865–91. https://doi.org/10.1177/0093854809338545.

8.  Lösel F, Schmucker M. The effectiveness of treatment for sexual offenders: a comprehensive meta-analysis. J Exp Criminol. 2005;1: 117–46. https://doi.org/10.1007/s11292-004-6466-7.

9.  Seto MC, Marques JK, Harris GT, Chaffin M, Lalumière ML, Miner MH, et al. Good science and progress in sex offender treatment are intertwined: a response to Marshall and Marshall (2007). Sex Abus J Res Treat. 2008;20:247–55. https://doi.org/10.1177/1079063208317733.



10. Beech A, Freemantle N, Power C, Fisher D. An examination of potential biases in research designs used to assess the efficacy of sex offender treatment. J Aggress Confl Peace Res. 2015;7:204–22. https://doi.org/10.1108/JACPR-01-2015-0154.

11.• Lösel F, Link E, Schmucker M, Bender D, Breuer M, Carl L, et al. On the effectiveness of sexual offender treatment in prisons: a comparison of two different evaluation designs in routine practice. Sex Abus J Res Treat. 2020;32(4):452–75 **Recent single study comparing reoffending rates for a psychological treatment for sexual offending when different evaluation methods were used (e.g., propensity score matching vs. exact matching). The differences in outcomes detected emphasizes the need for more differential studies comparing different research designs.**

12. Schmucker M, Lösel F. The effects of sexual offender treatment on recidivism: an international meta-analysis of sound quality evaluations. J Exp Criminol. 2015;11:597–630. https://doi.org/10.1007/s11292-015-9241-z.

13. Walton JS, Chou S. The effects of psychological treatment for reducing recidivism in child molesters: a systematic review of randomized and nonrandomized studies. Trauma Violence Abuse. 2015;16:401–17. https://doi.org/10.1177/1524838014537905.

14. Alexander M. Sexual offender treatment efficacy revisited. Sex Abus J Res Treat. 1999;11:101–16. https://doi.org/10.1007/BF02658841.

15. Gallagher CA, Wilson DB, Hirschfield P, Coggeshall MB, MacKenzie DL. A quantitative review of the effects of sex offender treatment on sexual re- offending. Correct Manag Q. 1999;3:19–29.

16. Hanson RK, Gordon A, Harris AJR, Marques JK, Murphy W, Quinsey VL, et al. First report of the collaborative outcome data project on the effectiveness of psychological treatment for sex offenders. Sex Abus. 2002;14:169–94. https://doi.org/10.1177/107906320201400207.

17. Långström N, Babchischin KM, Fazel S, Lichtenstein P, Frisell T. Sexual offending runs in families: a 37-year nationwide study. Int J Epidemiol. 2015;44:713–20. https://doi.org/10.1093/ije/dyv029.

18. Harrison JL, O'Toole SK, Ammen S, Ahlmeyer S, Harrell SN, Hernandez JL. Sexual offender treatment effectiveness within cognitive-behavioral programs: a meta-analytic investigation of general, sexual, and violent recidivism. Psychiatry Psychol Law. 2020;27(1):1–25.

19. Andrews DA, Zinger I, Hoge RD, Bonta J, Gendreau P, Cullen FT. Does correctional treatment work? A clinically relevant and psychologically informed meta-analysis. Criminology. 1990;28:369–404. https://doi.org/10.1111/j.1745-9125.1990.tb01330.x.

20. Mpofu E, Athanasou JA, Rafe C, Belshaw SH. Cognitive-behavioral therapy efficacy for reducing recidivism rates of moderate- and high-risk sexual offenders: a scoping systematic literature review. Int J Offender Ther Comp Criminol. 2018;62(1):170–86. https://doi.org/10.1177/0306624X16644501.

21. Ward T, Gannon TA. Rehabilitation, etiology, and self-regulation: the comprehensive good lives model of treatment for sexual offenders. Aggress Violent Behav. 2006;11:77–94. https://doi.org/10.1016/j.avb.2005.06.001.

22. Marshall WL, Marshall LW, Olver ME. An evaluation of strength-based approaches to treatment of sex offenders: a review. J Criminal Psychol. 2017;7:221–8. https://doi.org/10.1108/JCP-04-2017-0021/full/pdf.

23.• Olver ME, Marshall LE, Marshall WL, Nicholaichuk TP. A long-term outcome assessment of the effects on subsequent reoffense rates of a prison-based CBT/RNR sex offender treatment program with strength-based elements. Sex Abus, 2020;32(2):127–153. Available from: http://www.ncbi.nlm.nih.gov/pubmed/30362904. **Large single study representing first outcome evaluation directly comparing a strength-based program to a traditional risk reduction/risk management program. Indicates some support for including strength-based elements in psychological treatment sexual offending.**

24. Marshall WL, Marshall LE, Serran GA, O'Brien MD. Rehabilitating sexual offenders: a strength-based approach. Washington, DC: American Psychological Association; 2011.

25. Willis G, Ward T. The good lives model: evidence that it works. In: Craig L, Dixon L, Gannon TA, editors. What Works in Offender Rehabilitation: An evidence based approach to assessment and Treatment: John Wiley & Sons; 2020. Chapter 17.

26.• Day A, Ross S, Casey S, Vess J, Johns D, Hobbs G. The intensity and timing of sex offender treatment. Sex Abus J Res Treat. 2019;31(4):397–409 **Review highlighting the absence of research concerning intensity and timing of treatment as potential moderators of sexual offending treatment outcome.**

27. Forde RA. Bad psychology: how forensic psychology left science behind. London: Jessica Kingsley Publishers; 2017.

28. Gannon TA, Ward T. Where has all the psychology gone? A critical review of evidence-based psychological practice in correctional settings. Aggress Violent Behav. 2014;19:435–46. https://doi.org/10.1016/j.avb.2014.06.006.

29. Bohar AC, Wade AG. The client in psychotherapy. In: Lambert MJ, editor. Bergin and Garfield's handbook of psychotherapy and behavior change. 6th ed. New York: Wiley; 2013.

30. Schmucker M, Lösel F. Does sexual offender treatment work? A systematic review of outcome evaluations. Psicothema. 2008;20:10–9.

31. Casey S, Day A, Howells K, Ward T. Assessing suitability for offender rehabilitation: development and validation of the treatment readiness questionnaire. Crim Justice Behav. 2007;34:1427–40. https://doi.org/10.1177/0093854807305827.

32. McMurran M, McCulloch A. Why don't offenders complete treatment? Prisoners' reasons for non-completion of a cognitive skills programme. Psychol Crime Law. 2007;13:345–54. https://doi.org/10.1080/10683160601060424.

33. McMurran M, Theodosi E. Is treatment non-completion associated with increased reconviction over no treatment? Psychol Crime Law. 2007;13:333–43. https://doi.org/10.1080/10683160601060374.

34. Olver ME, Stockdale KC, Wormith JS. A meta-analysis of predictors of offender treatment attrition and its relationship to recidivism. J Consult Clin Psychol. 2011;79:6–21. https://doi.org/10.1037/a0022200.

35. Parhar KK, Wormith JS, Derkzen DM, Beauregard AM. Offender coercion in treatment. Crim Justice Behav. 2008;35(9):1109–35. https://doi.org/10.1177/0093854808320169.

36. Friendship C, Falshaw L, Beech AR. Measuring the real impact of accredited offending behaviour programmes. Legal and Crim Psychol. 2003;8:115–27. https://doi.org/10.1348/135532503762871282.

37. Maguire M. Crime statistics, patterns and trends: changing perceptions and their implications. In: Maguire M, Morgan R, Reiner R, editors. The oxford handbook of criminology. Oxford: Clarendon Press; 1997. Chapter 7.

38. Olver ME, Nicholaichuk TP, Gu D, Wong SCP. Sex offender treatment outcome, actuarial risk, and the ageing sex offender in Canadian corrections: a long-term follow-up. Sex Abus. 2013;25:396–42. https://doi.org/10.1177/1079063212464399.

39. Falshaw L, Bates A, Patel V, Corbett C, Friendship C. Assessing reconviction, reoffending and recidivism in a sample of UK sex offenders. Legal Crim Psychol. 2003;8:207–15. https://doi.org/10.1348/135532503322362979.

40. Hollin CR. Evaluating offending behaviour programmes: does only randomization glisten. Criminol Crim Just. 2008;8:89–106. https://doi.org/10.1177/1748895807088587.



41. Duriez SA, Sullivan C, Latessa EJ, Brusman LL. The evolution of correctional program assessment in the age of evidence-based practices. Corr Pol Prac Res. 2018;3:119–36. https://doi.org/10.1080/23774657.2017.1343104.

42. Dowden C, Andrews DA. The importance of staff practice in delivering effective correctional treatment: a meta-analytic review of core correctional practice. Int J Off Therapy Comp Crim. 2004;48:203–14. https://doi.org/10.1177/0306624x03257765.

43. Chadwick N, DeWolf A, Serin R. Effectively training community supervision officers: a meta-analytic review of the impact on offender outcome. Crim Justice Behav. 2015;42:977–89. https://doi.org/10.1177/0093854815595661.

**Publisher's Note** Springer Nature remains neutral with regard to jurisdictional claims in published maps and institutional affiliations.

 Springer